[No. C054927. Third Dist. Mar. 23, 2009.]

WILLIAM HAUSELT, Plaintiff and Appellant, v.
COUNTY OF BUTTE, Defendant and Respondent.

552

COUNSEL

David Collins; Desmond, Nolan, Livaich & Cunningham and Gary Livaich for Plaintiff and Appellant.

Porter Scott, Stephen E. Horan and Scott H. Cavanaugh for Defendant and Respondent.

OPINION

**DAVIS, J.**[*]—This is an action for inverse condemnation in a flood control context. We uphold the judgment that found, with one exception, no inverse condemnation liability. We do so because the trial court, in this bench trial, decided all material issues, and properly found that defendant public entity's

---

[*]Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

activities met the applicable legal standard—the rule of reasonable conduct (also known as the reasonableness rule).

## BACKGROUND

In 1988, William Hauselt (plaintiff), an experienced property developer, purchased a 94-acre almond orchard about a mile north of Chico, eventually intending to develop the property as a residential subdivision. To date, plaintiff has been unsuccessful in obtaining development approval. A natural watercourse called Keefer Slough, which is on plaintiff's property, forms its northern boundary; the western boundary is adjacent to Highway 99. North of Keefer Slough are two parcels that were developed into the subdivisions of Carriage Estates (Carriage) and Wildflower Estates (Wildflower).

Keefer Slough is situated between Rock Creek to the north and Mud Creek to the south. For many years, Keefer Slough received floodwater overflow from Rock Creek via a natural stream bifurcation. The natural drainage in the area from Rock Creek is southwest toward plaintiff's property and Keefer Slough. Keefer Slough and Rock Creek are privately owned.

Plaintiff's property has had a history of periodic shallow flooding two to three times a decade. This history was confirmed by Department of Transportation records and photographs dating from the 1960's, and a 1989 flood map from the Federal Emergency Management Agency (FEMA) showing the property in a flood plain.

When plaintiff purchased his property in 1988, drainage improvements consisting of a pipe and ditch from the Wildflower property to Keefer Slough were present. Two months after plaintiff bought his property, he consented to Carriage drainage work on his property at Keefer Slough in return for the cooperation of defendant County of Butte (the County) with his development.

Plaintiff contends that County, through a series of activities over several years, implemented a 1979 Master Storm Drainage Plan (sometimes, the Master Drainage Plan) that made Keefer Slough a major part of the County's public drainage system. These activities increased the flow on the slough—causing plaintiff's property to flood—and resulted in a taking of plaintiff's property for public use. The County's principal activities were as follows:

—Carriage and Wildflower were drained using onsite detention ponds (i.e., onsite at each subdivision) and a drainage ditch and pipes into Keefer Slough. County accepted the drainage improvements for Carriage and Wildflower, including the pipes into Keefer Slough. (County requires developers to build detention ponds so that storm water drainage from developed sites does not

exceed predevelopment levels, and to dedicate to County these works and accompanying easements necessary to own and operate the drainage system. County and plaintiff stipulated that no evidence would be offered at trial that the subdivision detention ponds were unreasonably designed or constructed.)

—Plaintiff contended that County, in mid-1992, allowed developers on the north side of Keefer Slough (Carriage and Wildflower) to raise the north bank of the slough above the south bank. County claimed that the trial judge's onsite inspection of the property disputed this, as did other evidence.

—In the early 1990's, County built a new bridge over Keefer Slough at Garner Lane, which is upstream of plaintiff's property. Plaintiff contended the new bridge increased the flow in the slough, as the former bridge had been acting as a plug. County replied that plaintiff's property often flooded when the former bridge was in place, and that plaintiff's expert did not identify the new bridge as a substantial cause of plaintiff's flooding.

—In 1995, County adopted the North Chico Specific Plan (sometimes, NCSP) to implement the County's general plan in the area. According to plaintiff, the NCSP identified Keefer Slough as the area's primary drainage channel notwithstanding its inadequate flood capacity. County noted that the NCSP contemplated onsite drainage detention basins for developed property along Keefer Slough that would not increase the expected peak runoff, and also contemplated, in line with general plan policy, to carry out storm drainage by means of natural watercourses like Keefer Slough.

—Before a large storm hit the area at the end of 1996/beginning of 1997 (the 1997 storm), Rock Creek's sediment bed was three to five feet lower than Keefer Slough's and functioned as a natural weir (bifurcation) that limited flow into Keefer and isolated Keefer topographically. The 1997 storm evened out the elevations of these sediment beds, increasing the flow into Keefer Slough. The County in 1997 sponsored a federally funded project through the National Resources Conservation Service to restore the pre-1997 bed levels, but this restorative work was undone by a 1998 storm. Plaintiff contends that County "deliberately made permanent the radically changed Rock Creek-Keefer Slough flow regime that has taken [plaintiff's] property."

—Finally, plaintiff contends that County has prevented him from developing his land for residential use, but County maintains that plaintiff has had only one development proposal denied.

On March 31, 1998, plaintiff sued County for inverse condemnation and related torts.

Following a bench trial, the trial court concluded: (1) County's activities—in permitting the Carriage and Wildflower development north of Keefer Slough, in constructing the new Garner Lane Bridge, and in sponsoring the bed restoration project at the bifurcation of Rock Creek and Keefer Slough—were not individually, or in combination, unreasonable conduct that would impose inverse condemnation liability on County within the meaning of *Locklin v. City of Lafayette* (1994) 7 Cal.4th 327 [27 Cal.Rptr.2d 613, 867 P.2d 724] (*Locklin*). In a related vein, the trial court also found that Keefer Slough is a private watercourse, and that County's activities did not transform the slough into a public work or increase the flow of water in the slough or on plaintiff's land; (2) plaintiff's cause of action for inverse-based encroachment, founded on the Carriage and Wildflower drainage pipes and ditch into Keefer Slough, was time-barred; (3) plaintiff's tort claims were barred for failure to comply with the tort claims act (plaintiff does not appeal this ruling); and (4) plaintiff is entitled to $1,034 as just compensation for a temporary taking regarding Red Fox Court in Wildflower (prior to a storm in 1998, County placed material on plaintiff's property at Keefer Slough to prevent flooding into Red Fox Court. The trial court found that, although County properly undertook this work pursuant to its emergency police power and that plaintiff did not prove that this work caused his land to flood, the emergency work was still in place at the time of trial, and the court ordered the work removed; the parties stipulated to a damages award for this activity of $1,034).

### DISCUSSION

### 1. *Inverse Condemnation in the Flood Control Context*

Before delving into the issues plaintiff raises on appeal, we briefly examine the law concerning inverse condemnation in the flood control context.

■ Article I, section 19 of the California Constitution provides the basis for an inverse condemnation action by stating that private property may not be taken or damaged for public use unless just compensation has been paid. (*Odello Brothers v. County of Monterey* (1998) 63 Cal.App.4th 778, 785–786 [73 Cal.Rptr.2d 903] (*Odello*).)

Formerly, an exception to the rule of inverse condemnation liability was recognized in the flood control context. This liability exemption originally evolved from the "common enemy" doctrine in the common law. Under that doctrine, a landowner threatened by flooding could erect defensive barriers without regard to flow damage done to lower landowners. Because such activity was privileged when performed by a private party, it was generally considered privileged when performed by a public entity. (*Odello, supra,* 63 Cal.App.4th at p. 786 & fn. 4; see also *Locklin, supra,* 7 Cal.4th at pp. 348–349.)

This exception to inverse condemnation liability, however, incurred a flood of criticism. (See *Odello, supra*, 63 Cal.App.4th at p. 786.) And this led to changes in the law.

■ "Today neither a private owner nor a public entity has the right to act unreasonably with respect to other property owners. Neither may disregard the interests of downstream property owners, and a public entity may no longer claim immunity in tort or inverse condemnation actions." (*Locklin, supra*, 7 Cal.4th at p. 367.) With respect to flood control projects, the public agency is liable if its conduct poses an unreasonable risk of harm to the plaintiff, the unreasonable conduct is a substantial cause of the damage to the plaintiff's property, and the plaintiff has taken reasonable measures to protect his property. The rule of strict liability generally followed in inverse condemnation does not apply in this context. (*Locklin, supra*, 7 Cal.4th at pp. 367, 337–338; see *id.* at p. 378 (conc. opn. of Mosk, J.).)

This "reasonableness" rule was deemed to best serve two competing concerns in the flood control context: on the one hand, a public agency that undertakes a flood control project must not be deemed an absolute insurer; on the other hand, the damage potential of a defective public flood control project is clearly enormous. (*Bunch v. Coachella Valley Water Dist.* (1997) 15 Cal.4th 432, 442–443 [63 Cal.Rptr.2d 89, 935 P.2d 796] (*Bunch*), citing *Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 565–566 [253 Cal.Rptr. 693, 764 P.2d 1070] (*Belair*).) Reasonableness, in this context, involves a balancing of public need against the gravity of private harm, and aligns with the basis for inverse condemnation liability: when a public agency has acted unreasonably, the damaged property owner should be compensated because the owner has contributed more than his or her proper share to the public undertaking. (*Bunch, supra*, 15 Cal.4th at p. 443; *Locklin, supra*, 7 Cal.4th at pp. 337, 367–368; see also *Paterno v. State of California* (2003) 113 Cal.App.4th 998, 1003, 1019–1020 [6 Cal.Rptr.3d 854].)

■ This reasonableness rule of inverse condemnation liability has been applied in the following flood control contexts: (1) where a public flood control levee on the bank of a natural watercourse failed in an area historically subject to flooding (*Belair, supra*, 47 Cal.3d at pp. 555–557, 565–567); (2) where a public flood control system of dikes and levees that diverted and rechanneled water of a natural watercourse failed in an area historically subject to flooding (*Bunch, supra*, 15 Cal.4th at p. 447); and (3) where downstream damage was caused by an increased volume or velocity of surface waters discharged into a natural watercourse from public

activities or public infrastructure, or from the watercourse being converted into a public drainage system or public work (*Locklin, supra,* 7 Cal.4th at pp. 337–338; see *id.* at p. 378 (conc. opn. of Mosk, J.)).

Of these three flood control contexts that apply the reasonableness rule, it is the *Locklin* context that most resembles the situation before us.

█ This does not mean, however, that the flood control context always invokes the application of the reasonableness rule. For example, in *Akins v. State of California* (1998) 61 Cal.App.4th 1 [71 Cal.Rptr.2d 314], a public agency intentionally diverted water and flooded private property not historically subject to flooding in order to protect other property from flooding. (*Id.* at p. 33.) *Akins* distinguished this situation from that in *Belair* and *Bunch*: "On the one hand is the type of situation [i.e., *Belair, Bunch*] where a public entity tries to protect private property owners from a risk created by nature and in doing so may alter the risks created by nature, but the public entity's efforts fail. On the other hand is a situation [i.e., *Akins*] where government appropriates private property in order to protect other property, creating a risk which would not otherwise exist. We see no unfairness in applying a reasonableness standard to the first situation but not to the second." (*Akins, supra,* at p. 33.) As noted, and as we shall further explain later, the situation here resembles *Locklin,* which falls within the *Belair-Bunch* camp, and therefore the reasonableness rule applies.

### 2. *The Trial Court Did Not Fail to Decide the Central (Material) Issue of Whether County Implemented the Master Drainage Plan*

Plaintiff contends that, because the trial court failed to decide the "central issue" in this case—i.e., whether County implemented a 1979 Master Storm Drainage Plan that made Keefer Slough, and therefore his property, the public drainage hub—and because he presented substantial evidence to support a finding in his favor on this issue, reversal is compelled here (this evidence was primarily in the form of the Carriage and Wildflower drainage systems, the raising of Keefer Slough's north bank, the new Garner Lane Bridge, the 1995 North Chico Specific Plan, the 1997 Rock Creek bed restoration project, and the blocking of plaintiff's development). (See *Guardianship of Brown* (1976) 16 Cal.3d 326, 333 [128 Cal.Rptr. 10, 546 P.2d 298].) We disagree at the threshold of this contention. We find the trial court *did* decide this central issue (and did so against plaintiff).

The parties submitted to the trial court a "Joint Statement of Issues" for trial, which included the following issues:

"3. Plaintiff asserts that the public project and/or public benefit is for public storm drainage. The parties agree that the court[']s resolution of this issue of determining and defining the project and/or activity for public benefit may include the following:

"a. Whether [County] exercised control over Keefer Slough making it a public work.

"b. Whether [County] commissioned and implemented a master storm drainage plan that established a network of drainage consisting of both open and closed channels, utilization of Keefer Slough as the conduit for drainage and by diverting surface waters into Keefer Slough."

Plaintiff concedes the trial court decided issue No. 3a against him (although he claims this was done without evidentiary support; more on this later), but asserts the court completely failed to decide issue No. 3b. We disagree with this assertion.

A bit of background is in order. County commissioned the 1979 Master Storm Drainage Plan, which included Keefer Slough. The Master Drainage Plan's purpose was to set forth development drainage guidelines under one comprehensive plan. The Master Drainage Plan's primary author was civil engineer Jon Anderson.

Anderson's deposition testimony was read at trial. According to this testimony, Keefer Slough was the "ultimate drainage way" under the Master Drainage Plan, and the plan's principal objective was to "maximize everything into Keefer Slough and use that as an outfall." "The key to the whole plan," as described by this testimony, was an adequate outfall channel and, to a lesser extent, a collection manifold (i.e., a drainage hub), at the junction of Keefer Slough and Highway 99. Anderson cautioned that the Master Drainage Plan would be ineffective and should not be implemented without the outfall and manifold.

The outfall and manifold envisioned by the Master Drainage Plan were never built. Instead, as plaintiff notes, the evidence showed that County required the Carriage and Wildflower developers to build onsite detention ponds that eventually drained, via a ditch and pipes, into the north bank of Keefer Slough (which is on plaintiff's property). As noted previously, County requires developers to build detention ponds so that storm water drainage from developed sites does not exceed predevelopment levels. The parties

stipulated at trial that no evidence would be offered that the subdivision detention ponds were unreasonably designed or constructed.

On the issue of the Master Drainage Plan implementation, the trial court ruled as follows: "Over the years, the County hired consultants to study drainage and flooding problems in the area. To mitigate flooding and drainage problems, developers were required to build detention ponds so that storm water drainage from developed sites did not exceed pre-development levels. Developers are required to dedicate to the County these works and easements necessary to own and operate the drainage system. A 1979 study proposed a diversion channel from Rock Creek north of Keefer Slough to upper Mud Creek south of Keefer Slough and a Master Storm Drain Plan [i.e., the Master Drainage Plan] which included a detention manifold on Keefer Slough at Highway 99. ([D]epo J. Anderson 111–112.) *The County did not adopt the plan or construct* the diversion channel or *the manifold. Instead, the studies were used as a guide, for information on the effects of the natural bifurcation and the direction of natural drainage in the area.* [Citations.]" (Italics added.)

Accordingly, the trial court *did* decide the allegedly overlooked central issue. The court concluded that County did not implement the Master Drainage Plan that envisioned Keefer Slough as the public drainage hub using an outfall channel and a collection manifold. Instead, County implemented a distinct drainage system based on onsite (i.e., on-subdivision) detention ponds designed to not exceed predevelopment drainage levels into Keefer Slough, and County used the Master Drainage Plan as an informational guide. Because we have concluded that the trial court did decide this issue, we need not consider whether plaintiff has presented substantial evidence to support a finding in his favor on this issue so as to compel a reversal. (See *Guardianship of Brown, supra,* 16 Cal.3d at p. 333.)

Plaintiff raises his remaining issues on appeal as if we had decided this initial issue in his favor and were simply offering guidance for the retrial. Nevertheless, most of these issues stand on their own on appeal and we will turn to them now.[1]

---

[1] The one issue that does not stand on its own in this appeal and that we will therefore not consider is plaintiff's interpretation of a particular stipulation and order in this matter that he contends allowed evidence of regulatory action to prove a physical taking. Plaintiff has phrased this issue as, "In remanding for a new trial, this court should hold that the September 30, 2002, stipulation and order allows evidence of County regulatory action to prove a physical taking." We are not remanding for a new trial. In any event, we have considered in this appeal the County's regulatory action in denying, to date, defendant's development proposal.

### 3. *Rule of Strict Liability in Inverse Condemnation Generally, Rule of Reasonable Conduct in Inverse/Flood Control Context, and Sufficiency of Evidence Regarding Certain Inverse Findings*

Plaintiff contends the trial court erroneously assumed that the rule of reasonable conduct (i.e., the reasonableness rule) applied to this inverse condemnation action when actually the rule of strict liability did.

The trial court found that County's actions in "permitting" development north of Keefer Slough (i.e., Carriage, Wildflower), in "constructing" the new Garner Lane Bridge over the slough, and in "sponsoring" the Rock Creek bed restoration project at the bifurcation of the slough were not individually, or in combination, unreasonable conduct which would impose liability upon County within the meaning of *Locklin, supra,* 7 Cal.4th 327. The trial court also found that Keefer Slough is a private watercourse, and that County did not exercise a level of control over, or assume maintenance responsibility for, the slough to make it a public work.

Plaintiff argues that it "is clear under *Locklin* . . . that the liability standard in a riparian [i.e., watercourse] flood control context turns upon whether the defendant 'has incorporated the watercourse into a public drainage system or otherwise converted the watercourse itself into a public work.' *Locklin,* [*supra,*] 7 Cal.4th at [p.] 338. If the defendant has done so, the general rule of strict liability applies. Otherwise the plaintiff must prove unreasonable conduct. *Id.* at [pp.] 361–362." (Underscoring omitted.)

As just noted, the trial court found that County did *not* convert Keefer Slough into a public work. Plaintiff, however, challenges the sufficiency of the evidence to support this finding, an issue we will discuss later in this opinion. More importantly at this stage, though, is that plaintiff's argument is based on a misreading of the law set forth in *Locklin.*

■ Contrary to plaintiff's argument, *Locklin* does not stand for the legal proposition that when a watercourse has been converted into a public work, and flood damage results, the rule of strict liability always applies. For example, in the flood control context before us—where there has been an alleged increased discharge of water into a watercourse (Keefer Slough) from public activities or public infrastructure, and where the watercourse is on land historically subject to flooding—the reasonableness rule applies.

The application of the reasonableness rule here is borne out by *Belair,* where a public flood control levee on the bank of a natural watercourse failed in an area historically subject to flooding, and the reasonableness rule was applied. (*Belair, supra,* 47 Cal.3d at pp. 554–557, 565–567.)

This application is also borne out by *Bunch*, where a public flood control system of dikes and levees around a natural watercourse failed in an area historically subject to flooding, and the reasonableness rule was applied. (*Bunch, supra*, 15 Cal.4th at p. 447.)

■ And, most significantly, this application is borne out by *Locklin* itself, which stated along these lines: "[A] public agency that act[s] unreasonably in regard to its use or alteration of a natural watercourse might be liable in inverse condemnation for downstream damage. [¶] . . . [¶] The Court of Appeal erred, therefore, in holding that a public entity may not be found liable in inverse condemnation for damage to private property caused by the manner in which surface water runoff from its property is discharged into a natural watercourse. . . . [¶] This is not to say that public entities incur absolute liability for any damage caused by the runoff of surface water from improvements on its property into a natural watercourse or from public improvements constructed in or on a watercourse. Again, as we held in *Belair* . . . , with respect to flood control projects, the public agency is liable only if its conduct posed an unreasonable risk of harm to the plaintiffs, and that unreasonable conduct is a substantial cause of the damage to plaintiff's property. The rule of strict liability generally followed in inverse condemnation [citation] is not applicable in this context." (*Locklin, supra*, 7 Cal.4th at pp. 366–367.)

■ Accordingly, the trial court properly applied the reasonableness rule to the context of this case.[2]

Now that we have rejected plaintiff's legal argument that the rule of strict liability applies here, we come to his factual argument that asserts the following three trial court findings are not supported by any evidence: (1) County lacked control over Keefer Slough or responsibility for its maintenance; (2) County played no role in raising Keefer Slough's north

---

[2] Plaintiff additionally argues, almost in passing, that the reasonableness rule does not comport with federal constitutional policy on takings, as expressed in the following quotation from the United States Supreme Court's regulatory taking decision in *First English Evangelical Lutheran Church v. Los Angeles County* (1987) 482 U.S. 304, 321–322 [96 L.Ed.2d 250, 107 S.Ct. 2378]: " '[A] strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change.' " We are not sure what to make of this general observation in the flood control context before us. We do note that the reasonableness rule has been approved by our state high court in *Belair, Locklin* and *Bunch*; that *Bunch* cited a United States Supreme Court decision—*Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104, 124–125 [57 L.Ed.2d 631, 98 S.Ct. 2646], noting that *Penn Central* cited reasonableness as a factor for consideration in an inverse condemnation action (*Bunch, supra*, 15 Cal.4th at p. 443); and that the Ninth Circuit views *First English* as permitting a court "to consider the nature as well as the legitimacy of the state's interest together with the nature and extent of its impact on the owner's use of his land" (*McDougal v. County of Imperial* (9th Cir. 1991) 942 F.2d 668, 676).

bank; and (3) County's projects and activities did not increase water flows and volume in Keefer Slough or on plaintiff's property.

We reject this factual argument for two reasons.

First, even assuming for the sake of argument that these findings are unsupported and that County actually did engage in these actions, for plaintiff to prevail under the applicable law here—the reasonableness rule—he must still show that County acted unreasonably and that he took reasonable measures to protect his own property. (*Locklin, supra*, 7 Cal.4th at pp. 338, 367; see *id.* at p. 378 (conc. opn. of Mosk, J.).) Plaintiff has not argued that County acted unreasonably. Indeed, plaintiff has argued on appeal that the rule of strict liability, rather than the reasonableness rule, applies. And plaintiff has not challenged the trial court's findings that County acted reasonably in permitting development north of Keefer Slough, in constructing the Garner Lane Bridge over the slough, and in sponsoring the restoration of the Rock Creek bed at the bifurcation of the creek and the slough.

Secondly, plaintiff has forfeited this argument because he has cited only the evidence favorable to him. (*Oliver v. Board of Trustees* (1986) 181 Cal.App.3d 824, 832 [227 Cal.Rptr. 1].) For example, to take the easiest of the three challenged findings to examine—that County played no role in raising Keefer Slough's north bank—plaintiff sets forth the evidence as follows: plaintiff testified that County's assistant director of public works admitted to him that County required developers to maintain Keefer Slough's channel and to raise its north bank; and County did not stop developers from raising the north bank of Keefer Slough. What plaintiff conveniently omits, however, is the following evidence: Keefer Slough is privately owned; a privately owned berm or levee existed on the north bank of Keefer Slough on plaintiff's property before the Carriage and Wildflower subdivisions were built; an old fence and a large tree near the top of this berm confirmed the berm had been there for many years (the trial judge conducted an onsite inspection of Keefer Slough, Rock Creek, the bridge crossings, the properties at issue, and County's drainage systems in the area, and saw this old fence and large tree); in the approved plans for Carriage and Wildflower, County permitted excess dirt at one location along the north berm in Wildflower, but did not permit either developer to increase the height of the berm; and the evidence was uncertain as to whether the berm had in fact even been raised.

Accordingly, we reject plaintiff's argument that the three trial court findings at issue are not supported by any evidence.

### 4. Statute of Limitations

Plaintiff contends the trial court erroneously ruled that the statute of limitations bars his inverse condemnation claim arising from County's drainage pipes and ditch near Carriage-Wildflower that encroach upon plaintiff's property at Keefer Slough.

At the outset, we reject both plaintiff's claim that County has waived this defense by failing to plead it specifically enough, and County's claim that plaintiff has waived this specific pleading requirement. The record shows the statute of limitations issue was fully briefed and litigated on its merits in the trial court.

That brings us to the question, what is the statute of limitations here? Plaintiff relies on *Pierpont Inn, Inc. v. State of California* (1969) 70 Cal.2d 282 [74 Cal.Rptr. 521, 449 P.2d 737] and *Lee v. Los Angeles County Metropolitan Transportation Authority* (2003) 107 Cal.App.4th 848 [132 Cal.Rptr.2d 444] for the answer. *Pierpont* and *Lee* concluded that for an inverse condemnation action involving continuous and repeated damage incident to a public improvement, the limitations period does not begin to run until the situation has stabilized. (*Pierpont, supra,* 70 Cal.2d at pp. 291–294; *Lee, supra,* 107 Cal.App.4th at p. 857; see also *Stonewall Ins. Co. v. City of Palos Verdes Estates* (1996) 46 Cal.App.4th 1810, 1843 [54 Cal.Rptr.2d 176].) For example, the plaintiff in *Lee* claimed that her property was damaged by construction of a public subway underneath the street adjacent to her property. The tunneling for the subway had removed and destabilized the soil under the property. (*Lee, supra,* 107 Cal.App.4th at pp. 851–852.) Plaintiff here claims this statute of limitations applies because his damage is ongoing.

We beg to differ, and think the five-year statute of limitations of Code of Civil Procedure sections 318 and 319 (for a possessory action involving real property), as described in *Baker v. Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862 [218 Cal.Rptr. 293, 705 P.2d 866] (*Baker*) and *Frustuck v. City of Fairfax* (1963) 212 Cal.App.2d 345 [28 Cal.Rptr. 357] (*Frustuck*), applies to the present matter.

*Baker* involved an inverse condemnation action alleging a continuing nuisance caused by noise, smoke, and vibrations from aircraft taking off and landing at defendant's nearby airport. The court deemed the gravamen of the cause of action to be one for physical invasion of the plaintiff's property. On that basis, the court applied the five-year statute of limitations of Code of Civil Procedure sections 318 and 319. (*Baker, supra,* 39 Cal.3d at pp. 865–868; see *Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 23 [32 Cal.Rptr.2d 244, 876 P.2d 1043] (*Hensler*).)

In finding the five-year statute of limitations applied, *Baker* relied on *Frustuck*. *Frustuck* was an inverse condemnation action based on a physical invasion of the plaintiff's property by the defendant city, whose agents *enlarged* a drainage ditch and created a berm on the property. (*Frustuck, supra,* 212 Cal.App.2d at p. 355; see *Hensler, supra,* 8 Cal.4th at p. 23.)

At issue here are County's drainage pipes and ditch near Carriage-Wildflower that *encroach upon* plaintiff's property at Keefer Slough. This is a physical invasion akin to *Baker* and *Frustuck,* and a fact pattern quite similar to *Frustuck.* Consequently, the five-year statute of limitations of Code of Civil Procedure sections 318 and 319 applies.

Did plaintiff meet this five-year statute of limitations? Substantial evidence supports the trial court's finding that he did not. (*Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 487 [59 Cal.Rptr.2d 20, 926 P.2d 1114] [when a statute of limitations runs is normally a question of fact].)

As noted, Carriage and Wildflower were drained using onsite detention ponds and a drainage ditch and pipes into Keefer Slough. County accepted the drainage improvements for Carriage and Wildflower, including the pipes into Keefer Slough, in August of 1989 and May of 1991, respectively. The Carriage-Wildflower drainage ditch was shown on a 1976 subdivision plan of the area. Plaintiff bought his property in 1988 and testified at trial that he discovered the ditch and pipes in 1992 (the pipes were capped with easily visible red flap gates). Plaintiff filed his inverse condemnation action on March 31, 1998, more than five years after any of these time posts.

Accordingly, the trial court correctly concluded that an inverse condemnation action based on the encroaching Carriage-Wildflower drainage pipes and ditch was time-barred.

### 5. *Attorney Fees on Appeal*

In his reply brief on appeal, plaintiff notes that after he filed his opening brief, County dismissed its cross-appeal from the judgment (i.e., the portion of the judgment that awarded plaintiff damages concerning Red Fox Court). Based on this dismissal, plaintiff requests attorney fees on appeal under Code of Civil Procedure section 1036. That statute requires an award of reasonable attorney fees and costs to an inverse condemnation plaintiff "in any appellate proceeding in which the plaintiff prevails on any issue in that proceeding." Plaintiff has not prevailed on any issue in this appellate proceeding; request denied.

### DISPOSITION

The judgment is affirmed. County is awarded costs of appeal.

Hull, Acting P. J., and Cantil-Sakauye, J., concurred.

A petition for a rehearing was denied April 13, 2009, and appellant's petition for review by the Supreme Court was denied June 10, 2009, S172597.