[No. B220270. Second Dist., Div. Seven. July 13, 2011.]

MALLORY ANNE HARTT et al., Plaintiffs and Appellants, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

## COUNSEL

Molino & Associates, Anthony Molino and Steven R. Berardino for Plaintiffs and Appellants.

Collins Collins Muir + Stewart, Douglas Fee, Eric Brown and Christian E. Foy Nagy for Defendants and Respondents.

## OPINION

## WOODS, J.—

### *INTRODUCTION*

This is an action filed as a wrongful death claim arising out of an accident on a road in the Deane Dana Friendship Community Park on March 24, 2008. The decedent, one Steven Hartt (Hartt), a retired police officer, was riding his bicycle in the park, which is located in an area of the Palos Verde Peninsula containing hills and an upper and lower portion. The accident occurred on a road which connects the upper and lower areas of the park. While bicycling from the upper area to the lower area, Hartt collided with a county-owned vehicle traveling in the opposite direction of Hartt. The vehicle was owned by the County of Los Angeles and operated by one Rickey Deshon Miller (Miller),[1] indisputably a county employee. The vehicle is described as a GM (General Motors) pickup truck. It is undisputed that Miller was in the course and scope of his employment as a park maintenance worker at the time of the accident. Plaintiffs and appellants are the survivors of Hartt, namely Mallory Anne Hartt, Bret Sean Hartt and David Brooks Hartt, the surviving wife and sons of the decedent, respectively. Unless context requires otherwise, the surviving Hartts will be referred to herein as the Hartts.

Judgment was entered upon a jury verdict in favor of the county and Miller, after trial on the sole issue of liability. The Hartts contend that the trial court erred in making numerous rulings before, during and following the verdict which deprived them of a fair trial. Fast-forwarding to the "Conclusion" section of appellants' opening brief, they state "This verdict was a clear miscarriage of justice and is not supported by any reasonable interpretation of the evidence. The court prejudicially hamstrung the Plaintiffs by improperly granting summary adjudication and then proceeded to exclude numerous items of evidence that would have (or at least very probably could have) lead to a different result.

---

[1] Unless context dictates otherwise, the defendants County of Los Angeles and Rickey Deshon Miller will most generally be referred to hereafter as the County.

"The Plaintiffs remaining cause of action for negligence was also doomed by the exclusion of photographic evidence that clearly established Miller's wanton lack of due care that lead to the death of Plaintiffs decedent, Steven Hartt. Given the gravity of the matter the Plaintiffs should have been permitted [to] present the truth to the jury about the nature of the road and Miller's conduct.

"The court indicated that this should be a 'trial of evidence'. Unfortunately for the Plaintiffs it was anything but that. . . ."

After analyzing the contentions enumerated by the Hartts, as hereafter set forth, we conclude that no reversible error was committed by the trial court.

## FACTUAL AND PROCEDURAL SYNOPSIS

*Plaintiffs' first amended complaint.*

Plaintiffs' operative complaint is their unverified first amended complaint (FAC) filed on September 24, 2008, in the Los Angeles County Superior Court entitled "First Amended Complaint For Wrongful Death From: 1. Dangerous Condition Of Public Property And: 2. Negligence." Plaintiffs demanded a jury trial.

Plaintiffs named the following defendants in the FAC: The County of Los Angeles, Rickey Deshon Miller, Power Lite Rentals, Inc.,[2] and 50 fictitious defendants.

*County's answer to the FAC.*

On September 26, 2008, the County responded to the FAC by filing its "Answer Of Defendant County Of Los Angeles To Plaintiffs' First Amended Complaint," containing a general denial and 28 affirmative defenses.

*County's motion for summary adjudication on the first cause of action.*

On March 24, 2009, the County filed its motion for summary adjudication on plaintiffs' first cause of action pursuant to Code of Civil Procedure section 437c, subdivision (f)(2) contending the immunities set forth in Government Code section 831.4 bar plaintiffs' first cause of action because the use and purpose of the road was for recreational purposes.

---

[2] Power Lite Rentals, Inc., is not a party in the appeal, having been previously dismissed from the action in the trial court.

After the filing of timely opposition to the motion for summary adjudication and a hearing thereon, the trial court found in favor of the County and signed its order granting the motion on June 18, 2009, setting forth with specificity its reasons for granting the motion and further indicating that on entry of final judgment in the matter defendants shall have judgment in their favor on the first cause of action.

*County's motion for bifurcation to try liability before damages on the remaining negligence cause of action.*

Relying on Code of Civil Procedure section 598,[3] the County moved for bifurcation to try the issue of negligence before considering the issue of damages. Following argument, and offers of proof, the court granted the motion. The Hartts make no contention on appeal the trial court committed error in its ruling that the issue of liability will be presented to the jury before considering the issue of damages.

At the conclusion of the evidentiary phase of the jury trial the jury was given a jointly prepared special verdict. The first question was whether the county and Miller had been negligent. The jury answered "No" and, following instructions to refrain from answering other questions, the jury rendered a nine-to-three verdict in favor of the county and Miller. The Hartts make no contention pertaining to any error as to the form of the special verdict or any claim of jury misconduct.

---

[3] Code of Civil Procedure section 598 states: "The court may, when the convenience of witnesses, the ends of justice, or the economy and efficiency of handling the litigation would be promoted thereby, on motion of a party, after notice and hearing, make an order, no later than the close of pretrial conference in cases in which such pretrial conference is to be held, or, in other cases, no later than 30 days before the trial date, that the trial of any issue or any part thereof shall precede the trial of any other issue or any part thereof in the case, except for special defenses which may be tried first pursuant to Sections 597 and 597.5. The court, on its own motion, may make such an order at any time. Where trial of the issue of liability as to all causes of action precedes the trial of other issues or parts thereof, and the decision of the court, or the verdict of the jury upon such issue so tried is in favor of any party on whom liability is sought to be imposed, judgment in favor of such party shall thereupon be entered and no trial of other issues in the action as against such party shall be had unless such judgment shall be reversed upon appeal or otherwise set aside or vacated.

"If the decision of the court, or the verdict of the jury upon the issue of liability so tried shall be against any party on whom liability is sought to be imposed, or if the decision of the court or the verdict of the jury upon any other issue or part thereof so tried does not result in a judgment being entered pursuant to this chapter, then the trial of the other issues or parts thereof shall thereafter be had at such time, and if a jury trial, before the same or another jury, as ordered by the court either upon its own motion or upon the motion of any party, and judgment shall be entered in the same manner and with the same effect as if all the issues in the case had been tried at one time."

*Judgment in favor of county and Miller.*

In reliance on the special verdict, the court entered judgment against plaintiffs on August 20, 2009. To bring the evidence adduced by both sides and considered by the jury into proper focus pertaining to the issue of liability, it is appropriate to summarize the opening statements to the jury depicting divergent views of what happened.

*Opening statement of the Hartts.*

The Hartts' opening statement described Hartt as "an avid bicyclist" who "rode his bicycle 40, 50 miles a day, including trips through Friendship Park" and who "was very familiar with the Park." Hartt "would finish his daily bike ride by traveling on a road that traverses Friendship Park," which "is on a slope." Hartt would enter "at the upper reach of the Park and it drops in elevation to where you exit out the other end." Yet, "the area on the road where the accident occurred is relatively flat."

Defendant Miller was traveling at a speed "far too fast" for conditions and was traveling on the "wrong side of this recreational trail." The evidence would be "13 to 15 feet of skid" that "manifested themselves on the left-hand side of the road for Mr. Miller." Though "there is a posted speed limit in the park, 15 miles an hour," the Hartts had a witness who would say "the policy at the Park when driving a County vehicle inside the Park was to travel no more than five miles an hour."

The Hartts have retained an accident reconstruction expert. Among other investigation including park visits and measurements, "he videotaped the bicycle trails [*sic*] coming down the road" and concluded that defendant Miller "was traveling between 16 and 18.2 miles per hour."

*Opening statement of the County.*

Defense counsel gave a bluntly different view of the case. First, counsel expressed hope that the jury had listened very carefully to the promises of evidence since the defense wanted the jury to "[p]lease listen carefully because I want you to hold me to it." When defendant Miller and Hartt came onto the portion of the trail where the accident happened, "they had an equal opportunity to see each other. Mr. Miller could see Mr. Hartt, Mr. Hartt could see Mr. Miller."

The Hartts failed to mention that when Miller saw Hartt, Miller hit the brakes, laid down skid marks, and turned the truck to get off the trail and away from the oncoming bicyclist. In contrast, having the same opportunity,

Hartt did not take the same evasive action. Therefore, the jury would be asked to decide who was responsible for the impact: the person who had taken the unsuccessful evasive action, or the person who had not.

*Summary of contentions on appeal.*

The contentions on appeal as stated by appellants can be grouped into three categories. The first category pertains to the rulings of the trial court before trial on the merits. The second category deals with the rulings of the trial court on specific items of evidence during the trial. The third category addresses postverdict motions which appellants contend were erroneously decided by the trial court. We deal with each category in turn hereafter, but note that the standard of review in most instances involves a mixture of three principles, namely, the well-established rule of the existence of substantial evidence sufficient to support the judgment, abuse of discretion in ruling on items of evidence and de novo review in certain instances.

*Pretrial rulings of the court.*

Appellants contend the first error occurred when the trial court granted summary adjudication in favor of the County based upon a statutory Government Code immunity which appellants maintain was not pled, let alone proven.[4] The effect of this ruling based upon an in limine motion was to preclude all evidence concerning negligent maintenance of the road or its surroundings thereby excluding evidence that would have established the liability of the county for maintaining a dangerous condition of public property.

In its motion for summary adjudication of issues under Code of Civil Procedure section 437c, subdivision (f)(2), the County addressed the cause of action for dangerous condition of public property under Government Code section 831.4, subdivision (b), generally referred to as "recreational trail immunity." After associated filings, the court determined on undisputed facts that the accident location was a "recreational trail" and ordered adjudication for the County.

We first determine the proper standard of review on appeal when the trial court, as in this instance, grants summary adjudication. Neither appellants nor respondents contest the proposition that the standard of review is de novo.

---

[4] The record reflects that this is an inaccurate statement. In the County's "First Amended Answer of Defendant County of Los Angeles to Plaintiffs' First Amended Complaint," filed May 14, 2009, the County pled as its 29th affirmative defense as follows: "29. Plaintiffs' complaint, and the whole thereof, is barred by recreational path immunity pursuant to Government Code § 831.4."

Appellants cite *Romero v. American President Lines, Ltd.* (1995) 38 Cal.App.4th 1199 [45 Cal.Rptr.2d 421]. The County cites *Schelbauer v. Butler Manufacturing Co.* (1984) 35 Cal.3d 442, 452 [198 Cal.Rptr. 155, 673 P.2d 743]. We proceed accordingly.

Government Code section 831.4 provides in its entirety as follows:

"A public entity, public employee, or a grantor of a public easement to a public entity for any of the following purposes, is not liable for an injury caused by a condition of:

"(a) Any unpaved road which provides access to fishing, hunting, camping, hiking, riding, including animal and all types of vehicular riding, water sports, recreational or scenic areas and which is not a (1) city street or highway or (2) county, state or federal highway or (3) public street or highway of a joint highway district, boulevard district, bridge and highway district or similar district formed for the improvement or building of public streets or highways.

"(b) Any *trail* used for the above purposes.

"(c) Any paved trail, walkway, path, or sidewalk on an easement of way which has been granted to a public entity, which easement provides access to any unimproved property, so long as such public entity shall reasonably attempt to provide adequate warnings of the existence of any condition of the paved trail, walkway, path, or sidewalk which constitutes a hazard to health or safety. Warnings required by this subdivision shall only be required where pathways are paved, and such requirement shall not be construed to be a standard of care for any unpaved pathways or roads." (Gov. Code, § 831.4, italics added.)

It bears repeating that in ruling on a motion for summary judgment or on summary adjudication issues, the trial court is confronted with the initial question of whether there are triable issues of material fact requiring resolution by the trier of fact, whether by the trial judge or the jury as in this case. We conclude that on this record summary adjudication was properly granted on the first cause of action by the trial judge for want of any fact issues that needed to be determined by the jury. This court's decision is particularly buoyed by what appears to be a concession or admission during plaintiffs' opening statement to the jury that Miller was traveling on the "wrong side of the *recreational trail*." (Italics added.)

■ Looking now to the statute in question and applying the time-honored principle of statutory interpretation that the appellate court will not look

beyond the wording of a statute if it is clear on its face, we determine that Government Code section 831.4 is clear on its face. The question thus becomes whether there are any facts adduced by appellants which would deprive the county and Miller of the immunity set forth by the Legislature in Government Code section 831.4, subdivision (b). We have reviewed and analyzed the evidence adduced by appellants and find it wanting, taking into consideration the backdrop of the clear wording of the statute.

We find respondents' legal argument on this issue to be accurate and persuasive as stated in the respondents' brief on appeal as follows: "While the Hartts complain of limitations on their evidence, its exclusion was consistent with—even mandated by—the Legislature's pronouncements on the purpose and availability of recreational trail immunity. The trial court's ruling furthered that legislative purpose.

█ " 'A core function of the Legislature is to make statutory law, which includes weighing competing interests and determining social policy. A core function of the judiciary is to resolve specific controversies between parties. As part of that function, the courts interpret and apply existing laws such as statutes of limitation. [Citation.] Separation of powers principles compel the courts to carry out the legislative purpose of statutes and limit the courts' ability to rewrite statutes where drafting or constitutional problems appear.' [(*Perez v. Roe 1* (2006) 146 Cal.App.4th 171, 177 [52 Cal.Rptr.3d 762].)]

█ "The whole point of Government Code section 831.4 is to encourage public entities to keep recreational areas open, sparing the expense of putting undeveloped areas in a safe condition, and preventing the specter of endless litigation over claimed injuries. [(*Armenio v. County of San Mateo* (1994) 28 Cal.App.4th 413, 417 [33 Cal.Rptr.2d 631].)] The only way to further that purpose is for courts to refrain from second-guessing the merits of the Legislature's decision on immunity. Only the Legislature is the coordinate branch of government for determining social policy through the immunity of Government Code section 831.4, subdivision (b). [(See *People v. Bunn* (2002) 27 Cal.4th 1, 14–15 [115 Cal.Rptr.2d 192, 37 P.3d 380] [the Legislature's law-making function 'embraces the far-reaching power to weigh competing interests and determine social policy'].)]"

A summary of the contentions of the Hartts to circumvent the statutory immunity provided by the Legislature in Government Code section 831.4, subdivision (b) is as follows, in anticipation that a dangerous condition of public property can be established: poorly maintained lines of sight, poor maintenance in allowing overgrowth of the vegetation and negligent design.

The County's motion presented undisputed facts establishing use of the trail itself as a recreational site and for hiking, riding, vehicular riding, or

sports recreation or scenic areas. This court again emphasizes the language utilized by plaintiffs in their counsel's opening statement which refers to, among other things, "recreational trail." After considering the clear language of Government Code section 831.4, we would be remiss to hold that the Hartts have circumvented the immunity statute and their first cause of action for dangerous condition of public property is still viable.

While the Hartts initially opposed the County's motion on the ground the trail served no recreational purpose, the Hartts eventually conceded that the trail served both a recreational purpose and a means of access for service vehicles.

■ It appears that neither side in this lawsuit contests the fact that the trail was used for mixed purposes. On the one hand, the trail was clearly used for recreational purposes. On the other hand, the trail was used for maintenance access to various and sundry locations within the entire park. The question that must be answered is whether this dual or mixed use circumvents the immunity provided by the Legislature in Government Code section 831.4. We find no such exception on the face of the statute. We conclude by saying that the Legislature knows how to create statutory exceptions but apparently chose not to do so in this instance.

We find the argument of respondents on this issue to be persuasive in stating: "No doubt it is cheaper to build fences and keep the public out than to litigate and pay three, four, five or more judgments each year in perpetuity. But that would deprive the public of access to recreational opportunities. If public entities cannot rely on the immunity for recreational trails, they will close down existing trails and perhaps entire parks where those trails can be found. *See Milligan v. City of Laguna Beach* (1983) 34 Cal.3d 829, 833 [196 Cal.Rptr. 38, 670 P.2d 1121]. As the Legislature has seen fit to provide immunity for any trail 'used for' recreational purposes—and the undisputed evidence showed that this one was—the trial court correctly adjudicated the issue of trail immunity."

We find no error in the trial court's holding that immunity under Government Code section 831.4 was properly applied in this case.

*Evidentiary rulings.*

We now turn our attention to the Hartts' claim of trial court error in ruling on evidentiary matters. The evidence rulings of the trial court are considered under the abuse of discretion standard stated in Evidence Code section 352 as follows: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will

(a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

The Hartts take exception to three items of evidence. The first is exhibit 1-10, a photograph of the trail which the court allowed into evidence if prejudicial material were digitally removed. Photographs of vehicles distorting the perspective of the path were also excluded from trial as misleading. The court agreed that the distorted perspective of exhibit 1-A caused a misleading effect. Exhibit 32 was excluded due to a depiction of a bloodspot and a car that distorted trail dimensions.

The trial court repeated that some of the photographs would be unduly prejudicial because of blood, police cars, and misleading perspective, though nothing prevented the Hartts from putting on other equally probative evidence to establish liability. The Hartts agreed that they were able to elicit testimony in lieu of the photographic evidence.

The Hartts have not articulated any convincing reason to admit the "unaltered" forms of the photos that would outweigh the unduly prejudicial effect of showing blood, the twisted carcass of Hartt's bicycle, a sheet used at the scene, and the police car situated diagonally across the trail. We find no abuse of discretion by the trial court in its evidentiary rulings.

*Postverdict motions and rulings.*

The Hartts made two postverdict motions and contend the trial court committed reversible error in not granting them the relief they requested. The first was a motion for judgment notwithstanding the verdict (JNOV) and the second was a motion for new trial. We note that the Hartts expend very little effort on appeal to "flesh out" their contentions other than to merely state that the motions were erroneously ruled upon. Nevertheless, we address each motion hereafter.

*JNOV Motion.*

The County accurately and extensively states the burden of proof when a trial court is confronted with a motion for JNOV. The County contends that the standard of review is one in which the appellate court embarks on a search of the record for evidence that will support the verdict. As the County states, "A motion for JNOV may be granted only when there is no substantial evidence to support the verdict, viewing the evidence in the light most favorable to the party securing the verdict. [(*Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 878 [151 Cal.Rptr. 285, 587 P.2d 1098].)] 'If there is any substantial evidence, or reasonable inferences to be drawn therefrom,

in support of the verdict, the motion should be denied.' [(*Ibid.*; see also *Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 217 [26 Cal.Rptr.3d 798].)] The court resolves all conflicts in the evidence and draws all reasonable inferences in favor of the verdict. [(*Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.* (2010) 188 Cal.App.4th 401, 418 [115 Cal.Rptr.3d 707].)] 'As in the trial court, the standard of review is whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion.' [(*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68 [104 Cal.Rptr.2d 602, 18 P.3d 29].)]

"An appellant asserting lack of substantial evidence must fairly state all the evidence, not just the evidence favorable to the appellant. [(*Chicago Title Ins. Co. v. AMZ Ins. Services, Inc., supra,* 188 Cal.App.4th at p. 415.)] The appellant must 'marshall *all* of the record evidence relevant to the point in question and affirmatively demonstrate its insufficiency to sustain the challenged finding.' [(*Ibid.,* quoting *Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 557 [66 Cal.Rptr.3d 1], original italics.)] A failure to state all material evidence may be deemed a waiver of the argument that the evidence was insufficient. [(*Hauselt v. County of Butte* (2009) 172 Cal.App.4th 550, 563 [91 Cal.Rptr.3d 343].)]"

With the aforementioned standard of review in mind, we now evaluate respondents' summary of evidence with reasonable inferences therefrom including statements by counsel based on reasonable inferences which are purported to be substantial and supportive of the verdict and judgment.

### 1. *The Park as Described by Supervisor Bosell.*

The park's supervisor, Kim Bosell, testified. Ms. Bosell confirmed that the location where the accident happened (at various times also referred to as a "road" or a "path") is a recreational trail. The intended use of the trail is for park visitors (including pedestrians, dog walkers, bicyclists, joggers and others) to view the park's vegetation and enjoy scenery on the way to Vista point at the park's upper levels, and the purpose of the trail is to enhance the visitors' recreational enjoyment of the park.

Besides serving as a place from which park visitors can observe vegetation and wildlife, the trail allows park visitors to transit between the nature center at the lower end of the park and Vista point and restrooms at the park's upper end. The trail is not a dedicated street or highway, it is closed to through traffic, and it is used intermittently by park vehicles (sometimes once or twice a day, some days not at all). The occasional use by vehicles is not nearly as constant as the recreational use to which the trail is put. There are no other ways for park maintenance workers to go back and forth through the park other than by traveling on the park trail.

2. *The Accident Circumstances as Described by Defendant Miller and Others.*

Miller was employed by the county as a grounds maintenance and custodial worker at the park. He was working at the time of the accident, which occurred about 12:55 p.m.

Generally at that time of day, there was no one in the park. On a typical weekday, around the middle of the day, Miller would encounter no park visitors except Hartt, whom he would see several times a week, usually between 1:45 and 2:00 p.m. Miller knew and liked Hartt, who was a regular bicyclist at the park.

The trail's lower gate is where Miller would generally see Hartt. If Miller was at the gate and saw Hartt coming down, he would wait for Hartt with the gate open. Miller would speak with Hartt when Miller was opening or closing the lower gate. Miller used to tell Hartt that he needed to slow down coming through there, indicating that Hartt routinely rode through the park at excessive speed.

The trail has vegetation on both sides. The plants impaired Miller's visibility a little bit, but he could see others coming toward him, and they could see him going up the trail. Visitors on the trail could also hear Miller's noisy truck coming from 100 yards away, and would walk to the side of the trail. If the visitors were walking dogs, they would exhibit caution by putting their dogs on leashes when the truck approached.

The trail's speed limit is 15 miles per hour. This was confirmed by an investigator, Officer Grundy, who himself drove on the trail at 15 miles per hour. For reference (as established in expert testimony), 15 miles per hour is also the speed limit in alleys where people are backing out of driveways, while in the vicinity of schools where children are running around the speed limit is 25 miles per hour, and for Miller to travel at around 15 miles per hour in the park was not unreasonable. A suggestion that five miles per hour should be the speed limit was shown by expert testimony to be simply unrealistic and that 15 miles per hour is a slow speed in itself.

At the moment Miller first saw Hartt, Miller estimated that his truck had two or three feet of clearance from his right side of the trail, and he believes he was traveling at 14 or 15 miles per hour. Miller first saw Hartt coming out of a curve. Expert testimony put the length of the straightaway between curves at 77 feet. Miller was past the lower curve and in the straightaway when he first saw Hartt.

Miller told an investigator he observed Hartt traveling at an estimated 30 miles per hour, and in any event it appeared Hartt was going very fast. Miller

told the jury that he saw Hartt turn his handlebars to the right, but Hartt was going so fast, the handlebars turned back in to the left.

Whatever handlebar movement Miller may have seen, it did not succeed as an evasive maneuver. This, despite Hartt's greater ability while operating a bicycle to react and direct his vehicle more quickly than a truckdriver could.

There was very little time between the moment when Miller first saw Hartt and the impact. Miller was still able to turn his steering wheel to the right as hard as he could and hit the brakes before the impact. The truck laid down skid marks before impact, with the left skid mark remaining entirely on the trail, and the right skid mark continuing about a foot into the off-trail shrubbery.

### 3.  *The Accident Circumstances as Described by Defense Accident Reconstruction Expert Miller.*

The defense called accident reconstruction expert Alan Keith Miller (expert Miller), a physicist with substantial qualifications. Expert Miller is qualified in the field of human factors: how motorists will react, their perception/ reaction time, and their accident avoidance. He formed opinions about impact location, vehicle speed at impact, whether either party took any evasive maneuvers, how fast they were going prior to any evasive maneuvers, and whether there was room available for both parties to avoid the accident if they had taken evasive maneuvers.

Addressing the impact location, expert Miller examined defendants' exhibit 195-1 and explained that it showed the end of the skid mark made by the truck's left wheel. Out in front of the skid mark were glass fragments from the truck's headlight and other debris. He noted all of the impact debris occurred near the end of the skid mark, to the north, which is the direction the truck was heading. The debris included the truck's turn-signal lens. Most of the debris was just forward of where the truck stopped. The debris was located primarily on the east side of the road, toward the bushes, and beyond the skid mark. In cross-examination, the Hartts strove to suggest that the debris, including broken headlight glass, had been moved, but expert Miller stood firm that it had not.

Expert Miller also reviewed defendants' exhibit 1-1 and explained that it showed the truck's right front skid mark going off into the bushes, the point where the left front skid mark stopped, and the collision fragments around and beyond the end of the left skid mark.

Expert Miller placed the impact toward the end of the skid marks, reasoning that this area was where the truck and bicycle collided, throwing the debris material to the north and to the east.

The skid marks' length and the surface friction allowed expert Miller to calculate the truck's speed in the 15-mile-per-hour range when it began to lay down skid marks, though he allowed that a slightly higher velocity was possible, even if he did not agree with it. The truck was getting close to the end of its skid when its bumper and Hartt's bicycle collided. The impact point was beyond the end of the skid, and the impact caused truck debris to be thrown north and east.

Expert Miller calculated that by the time of impact, the truck had slowed to about five miles per hour as it neared the end of its skid. Expert Miller believed Hartt was traveling at a speed of 16 to 18 miles per hour at impact, somewhere in the mid-to-high teens. If Hartt had been going 10 to 15 miles per hour on his right-hand side of the trail, however, there never would have been an accident.

No evidence existed to persuade expert Miller that Hartt slowed down or took any kind of evasive action whatsoever. There was no evidence that Hartt was riding along his right side of the trail. If he had been, he would have had plenty of room to get by defendant Miller's truck—at least five feet of space on a 12-foot-wide path, almost half the path's width. At the moment of impact, Hartt was definitely on the wrong side of the trail, and he did not need to be. Hartt could have easily avoided the accident if he had simply gone to the right of the truck where he had an estimated range of four to seven feet of space throughout the accident sequence.

Defendant Miller had taken his foot off the gas when rounding the curve before the straightaway where the accident happened. He was driving in the approximate 15-mile-per-hour range, and he perceived, he reacted, he swerved, he braked. In contrast, Hartt was on his left side of the path at the time impact occurred, he had space available to avoid the impact, there was no evidence about what Hartt might have been looking at or where his gaze was directed prior to impact, and the only explanation for his conduct was simple inattention. "Something is going on with Mr. Hartt that he doesn't see or doesn't appreciate or maybe he never saw the truck." Hartt was definitely on the wrong side of the road for him, and did not have to be there, in expert Miller's opinion.

Hartt had both time and space to miss the truck if he had been paying attention. The beginning of the truck's skid marks showed that where the skid marks started, the truck allowed Hartt three to four feet of room to the edge of the path. Going outward from the line of the skid mark, the truck's mirror and fender intruded at maximum another five inches into the space which made up the passing area otherwise available to Hartt. When the truck began to brake, skid, and turn, Hartt had three to four feet of space in which to

avoid the truck. At the time of impact, the available avoidance space had increased due to the truck's turning motion: Hartt had at least seven feet of space, more than half the roadway, to avoid collision.

Expert Miller believed Hartt was positioned toward the middle or on Hartt's left side of the trail when the truck first became visible to him, and that Hartt should have taken evasive action by steering to his right. The only reason expert Miller could think of to explain Hartt's behavior was a lack of attention. Hartt was well aware that vehicles such as the park truck traveled on the trail, and he should have anticipated it.

There was plenty of visual access between Hartt and defendant Miller which was available to Hartt. Hartt was able to both hear and see the truck before defendant Miller could see Hartt. While a perception-reaction time of one and a half seconds is assumed, most bicyclists can react easily within one second. A perception-reaction time of one and a half seconds would be extremely long for a bicyclist who sees a truck coming at him. Hartt had the advantage over defendant Miller in terms of time to respond. If Hartt had been on the right side of the path for him, however, there would have been nothing for him to react to and there would not have been an accident.

There was 77 feet of straightaway on the path between the curves. The curves in the path were irrelevant; it was what happened on the straightaway that mattered. Defendant Miller was well past the curve he had rounded when he saw Hartt in the straightaway regardless of what the Hartts now contend.

Expert Miller expressed the opinion that 15 miles per hour was a reasonable speed in the area where the accident happened. He disagreed with the somewhat confused statements of a lay witness (Alvaro Guzman) to the effect that five miles per hour in the park was the proper speed. That is less than idling speed, "just a fast walk," requiring the driver to stay on the brakes to prevent speeding up. For comparison, the speed limit in alleys is 15 miles per hour, and the speed limit around schools where children are present is 25 miles per hour. The Guzman testimony was meaningless in helping expert Miller to form his opinions.

### 4. The Accident Circumstances as Described by Plaintiff Accident Reconstruction Expert Brownell.

The Hartts called accident reconstruction expert Richard Brownell. Brownell ultimately opined that the impact took place about five feet east of the western edge of the asphalt surface of the trail.

His calculations rested on his view that the trail was 12 to 12½ feet wide and that the truck's width was between eight feet and eight feet four inches

though Brownell also said he had measured the truck as six feet six inches wide from one end of the bumper to the other.

Referring to exhibit 6, Brownell conceded that he had not determined the apex of the curves approaching the straightaway where the point of impact was located, though he still estimated the length of the straightaway between the curves at 67 feet to assess line of sight distance available to the bicyclist and truckdriver. Brownell supported his opinions by reference to a diagram he had prepared, marked as exhibit 36. Brownell held to his opinion that the point of impact was five feet from the trail's western edge.

Brownell gave no weight to the debris field. He strove to opine that the debris field was too far north to have been deposited directly from the impact (perhaps a suggestion that the debris had been moved), but his effort was interrupted by an objection and a ruling that the testimony be stricken. The Hartts do not contend this ruling was error.

Brownell acknowledged that at his deposition he forgot to bring his scene diagram. A second deposition was held to depose Brownell on his diagram. This diagram, however, was different from trial exhibit 36. Brownell's first diagram (attached to his deposition as exhibit H, and so referred to and admitted in the trial) showed the truck at a noticeably different angle on the trail.

Brownell admitted he had told deposing counsel he was thinking about making a new diagram. He was going to change the arching of the corners entering and leaving the straightaway. He did not tell defense counsel that he was going to change the truck's image. He planned to give counsel the new diagram as soon as it was completed, but instead waited until trial had started to reveal the new diagram.

Brownell admitted that exhibit H showed the truck blocking 100 percent of the trail, and that this was not correct. Despite insisting that he had not moved anything as between exhibits 36 and H, especially the truck, Brownell agreed that it looked different.

Brownell said that exhibit 36 showed five feet of space from the western edge of the trail to the point of impact between Hartt and the truck. On the different question of Hartt's line of travel, however, looking at exhibit 36 expert Miller had concluded that it showed Hartt moving from his right side to the left side of the path for him, into the area occupied by defendant Miller's truck.

While agreeing that if Hartt had ridden only 14 inches to his right, he would have avoided a collision, Brownell insisted that the five feet of

available accident avoidance space had been reduced by intrusion of the truck's mirror, and that there was not five feet of "usable roadway."

Elaborating on his theory about absence of room for Hartt to avoid impact, Brownell stated his opinion that the truck's mirror extended 14 inches past the truck's skid mark, with the result that there was less than one foot of "usable road" for Hartt. At the same time, however, Brownell assumed that Hartt saw and started reacting to defendant Miller at the same moment when Miller saw and started reacting to Hartt, concluding that each had seen the other at the same time.

Brownell agreed that a bicycle is more maneuverable than a truck. Brownell also agreed there was no evidence of where Hartt may have been looking at any particular time.

Brownell admitted that he himself had been in numerous accidents, including being hit by a truck while riding a motorcycle. He had even been in a single-vehicle two-wheel accident in which his arm was broken.

Referring to his own exhibits 36 and H, Brownell testified that a bicyclist in Hartt's situation could turn to the right, that dirt would not be an obstacle to such evasive action, that weeds would likewise not be a hindrance, and that Brownell would even go over a cliff to avoid being hit by a truck. Hartt, however, had taken none of these avoidance maneuvers Brownell recommended to avoid an accident like Hartt's.

5.  *Testimony of Safe Cycling Practices Expert Babington.*

There was a single expert at trial who testified on safe cycling practices: Richard Babington, called by the defense.

Babington testified that Hartt's bicycle was the type used by an "avid cyclist." Avid cyclists may ride differently alone than when they are in the company of other cyclists. To do so would be fairly common. In fact, it is the norm. When alone, it is just the cyclist, the cyclist's machine, and the road. Riding alone gives the cyclist an opportunity to test himself, his machine, and his abilities.

Babington had gone to the park and ridden the same path on his own bicycle, similar to Hartt's. Merely coasting downhill, Babington reached a speed of over 30 miles per hour through the curve before the straightaway, the same route Hartt traveled just prior to the accident. Babington had to "use up most of the roadway on the exit" because centrifugal force would draw him toward the outside of the curve.

Yet, the safest place for a cyclist to be when coming out of a corner is as far to the cyclist's right as possible.

### 6. *Testimony of Percipient Witness Rivera.*

The Hartts called witness Richard Rivera. Rivera would cycle with Hartt twice a week including in the park.

Rivera traveled this route with Hartt many times. Rivera classed Hartt as a very good cyclist, stronger than most, and typically the leader of the pack on a group ride.

When riding at the park, the two cyclists would follow the path down the hill single file. They would stay next to their side of the path through the curve, within one and a half feet of the edge.

We conclude that the aforementioned evidence summarized by the County is substantial and justifies a ruling in favor of the County. No error was committed by the trial court.

### *New Trial Motion.*

The County's argument that the denial of the Hartts' motion for new trial was proper is persuasive. The County contends that "A motion for a new trial can only be granted on the ground specified in the notice of intent to move for new trial. [(*Wagner v. Singleton* (1982) 133 Cal.App.3d 69, 72 [183 Cal.Rptr. 631].)] The Hartts' supporting memorandum addressed only sufficiency of the evidence and errors in law. With respect to the former, Code of Civil Procedure section 657 states that: [¶] 'A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict . . . unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the . . . jury clearly should have reached a different verdict or decision.'

"A trial court has broad discretion to rule on the new trial motion. [(*People v. Ault* (2004) 33 Cal.4th 1250, 1260 [17 Cal.Rptr.3d 302, 95 P.3d 523]; 8 Witkin, Cal. Procedure (4th ed. 1997) Attack on Judgment in Trial Court, § 143, p. 644.)] That ruling may be disturbed only for abuse of discretion. (*Ibid.*) The special verdict was agreed upon by all parties. The court concluded there was 'no evidence or authorities for me to conclude that the jury should have reached a different verdict or decision. There is no possible way that I could determine the negligence or liability should be divided up and that there were not other causes or factors.' "

## *DISPOSITION*

The judgment and orders are affirmed. Respondents are awarded costs of appeal.

Perluss, P. J., and Jackson, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 12, 2011, S195777.