Filed 5/3/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JACOBO G. GARCIA, a Minor, etc., et al., | B267613 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. GC050056) |
| v. | |
| AMERICAN GOLF CORPORATION et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Howard L. Halm, Judge. Reversed.

Robert D. Feighner; Law Offices of Edward J. Deason, and Edward J. Deason, for Plaintiffs and Appellants.

Michele Beal Bagneris, City Attorney, Ann Sherwood Rider, Assistant City Attorney; Law Offices of Michael R. Nebenzahl, Michael R. Nebenzahl; Carpenter, Rothans & Dumont, and Justin Reade Sarno, for Defendant and Respondent City of Pasadena.

Daley & Heft and Lee H. Roistacher for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendant and Respondent City of Pasadena.

_____

In this opinion, we hold that the trail immunity in Government Code section 831.4[1] does not immunize a dangerous condition of a commercially operated, revenue generating public golf course that causes injury to pedestrians on an adjacent trail. Consequently, we reverse the summary judgment entered in favor of City of Pasadena (City) on the claims by Jacobo G. Garcia (Jacobo) and his mother, Ana Pavon (Pavon), (collectively appellants) that they were injured by a dangerous condition of City owned property known as the Brookside Golf Course when Jacobo was hit by an errant golf ball on a walkway City contends is a trail.[2]

---

[1] All further statutory references are to the Government Code unless otherwise specified.

[2] Below, the parties disputed whether the walkway at issue is a trail under section 831.4. We need not decide that issue. Even if the walkway qualifies as a trail, City is not entitled to trail immunity. For purposes of this opinion, we presume without deciding that the walkway is a trail.

## FACTS

The Brookside Golf Course is owned by City and managed and operated by American Golf Corporation (American Golf) pursuant to a lease agreement. Within the Brookside Golf Course there are two 18-hole golf courses, the E.O. Nay Course and the C.W. Koiner Course.

The Rose Bowl Loop (Loop) is comprised of roadways (including West Drive) that encircle the Rose Bowl Stadium and the Brookside Golf Course. These roads provide access to recreational areas within the Central Arroyo Park and Brookside Park, including the golf course, stadium, a children's museum, tennis courts, aquatics center, baseball and soccer fields, equestrian facilities and open park space. People use the Loop for walking, jogging, skating and bicycling.

In 2001, after a person was hit by a golf ball outside the Brookside Golf Course, City erected safety nets at the 12th, 17th and 18th holes of the C.W. Koiner Course.

There is a 13-foot wide pedestrian walkway (walkway) along the Loop. To distinguish it from the black asphalt roadway, the walkway is light brown in color. Also, it is separated from the roadway by a 12-inch wide white painted line as well as flexible delineators that City placed on the white line at 100 foot intervals. The Brookside Golf Course is separated from the walkway by a concrete wall topped by a chain link fence. There are various chain link gates in the fence that give motor vehicles access to the golf course for use as a parking lot during major events at the Rose Bowl. Both the fence and gates are

3

approximately seven feet six inches high.[3]  Inside the Brookside Golf Course, posted on the fence surrounding it, there are warning signs that read:  "NOTICE  [¶]  YOU ARE WITHIN A GOLF COURSE AREA.  [¶]  YOU ASSUME THE RISK OF GOLF BALLS AND OTHER RECREATIONAL USERS."

On September 30, 2011, Jacobo was hit in the head by an errant golf ball while Pavon was pushing him in a stroller on the walkway.  They were traveling along West Drive and near the first post of the gate for Lot 6, which is adjacent to the 15th hole of the C.W. Koiner Course.

Appellants filed a government claim on February 22, 2012, which alleged:  "Claimant [Jacobo] was struck in the head by a golf ball.  He was transported by ambulance to Huntington Memorial Hospital and transferred to Children's Hospital where he was diagnosed with a brain injury, including a subdural hematoma.  He experienced significant pain, cognitive difficulties, urinary dysfunction, eye injuries, and emotional distress.  Claimant [Pavon] suffered emotional distress and the consequences of caring for [Jacobo]."  Regarding the acts or omissions of City, appellants averred:  "Failure of the public entity to protect against a dangerous condition on public property pursuant to [sections] 830 and 835.  The public entity permitted a dangerous activity of a golf course next to a public sidewalk/walking and biking area; failed to protect against the known risk of golf balls leaving the golf course and striking persons on public property, but not on the golf course; failed to

_____

[3]      Appellants maintain that although "the fence measures 7 feet, 6 inches above the sidewalk," it is "only 6 feet, 6 inches from the golf course elevation."

4

erect fences or other barriers to protect the public or arrange the golf course to minimize this risk or adequately warn golfers and pedestrians of this risk."

Appellants sued American Golf for negligence and City for dangerous condition of public property.

City filed a motion for summary judgment and argued there was no dangerous condition of the walkway, City did not have actual or constructive notice of a dangerous condition of the walkway, and City was entitled to immunity under sections 831.4, 830.6, 820.8, 820.2 and 835.4. Also, City argued that it could not be liable because warning signs were posted, and Pavon assumed the risk because she was aware of, or should have been aware of, the danger of errant golf balls.

In opposition, appellants argued that none of City's statutory defenses had merit in large part because a dangerous condition of the walkway was not at issue. Rather, the issue was a dangerous condition of the Brookside Golf Course, i.e., the fairways were too narrow and had too few trees, and the fences were too low. As for the warning signs, appellants argued, inter alia, that there was no evidence City erected them, and they did not provide a reasonable warning to pedestrians outside the golf course of the hazard posed by errant golf balls.

In support of their argument regarding the signs, appellants pointed out that Bahman Janka (Janka), City's project director for the walkway as well as transportation administrator of its Department of Transportation, testified during deposition that he does not know who installed the signs, when they were installed or who maintains them. In addition, Janka testified he does not know who owns the signs or fence around the Brookside Golf Course. David Sams (Sams), City's person most

5

knowledgeable concerning the management of the Brookside Golf Course and administration of the lease with American Golf testified during deposition that he does not know who erected the signs, when they were erected, or who owns the signs. Kyle A. Mitchell (Mitchell), the general manager of the Brookside Golf Course, testified during deposition that he is not aware of any signs warning pedestrians of golf balls. Appellants' civil engineering expert, Brad P. Avrit (Avrit), provided a declaration stating: "[T]he warning signs posted on the fence separating the golf course and the public walkway were not fully visible for an approaching pedestrian exercising reasonable care. . . . Furthermore, even if a pedestrian does read the warning signs, it is impossible to anticipate when and where a golf ball will come flying over the fence. . . . In addition, the warning on these signs [does] not tell a pedestrian what to do to protect themselves from a small, hard golf ball flying over the fence of the golf course. Thus, it is my opinion that the warnings signs posted every few hundred feet are not positioned to provide adequate warning, and thus do not adequately protect or warn pedestrians" who are using the walkway.

With respect to the design of the Brookside Golf Course, appellants submitted the expert declaration of Michael J. Hurdzan. He declared: The area where Jacobo was hit "is inherently unsafe for cars and pedestrians on or along West Drive because of errant golf balls entering that area." City knew or should have known that there "would be a reasonably high likelihood of golf balls landing in that vicinity. Protection of pedestrians using the [Loop] could have easily been accomplished by good design or remedial measures." "[G]olf course operators should be vigilant to observe any place on or near their golf

6

course where errant golf balls could hit unsuspecting people or property. This is especially true on a highly traveled area such as the [Loop] where the golf holes and probable play areas are so close together. At the 15th hole, the only barrier between the golf fairway and West Drive is a [six foot, eight inch] fence and some small and somewhat thin foliage trees that are more of a visual barrier than an effective ball stopping barrier. . . . The trees are not dense enough to stop golf balls, but being a visual barrier, actually contribute to [a problem] because golfers cannot see pedestrians to warn them, nor can pedestrians see all of the golfers or golf balls that could cause them harm. The trees are not effectual safeguards. The fence is too low to provide adequate protection."

In further support of their dangerous condition argument, appellants submitted the deposition of Sams in which he testified that he had personally hit golf balls over the fence near the Brookside Golf Course. He had seen about five people hit golf balls over the fence of the 15th hole of the C.W. Koiner Course. This occurred with either a tee shot or a second shot.

The trial court granted City's motion. In its written ruling, the trial court concluded that City was entitled to trail immunity. As a result, the trial court declined to reach City's other immunity defenses.[4]

---

[4] The trial court provided an advisory ruling on the following question: "despite the Trail Immunity, can City be liable for the dangerous condition of the Golf Course because City owns the Golf Course?" The trial court found triable issues as to whether there was a dangerous condition, whether City had actual notice of the dangerous condition, and whether City took sufficient action to protect against the risk of injury by posting warning signs.

A judgment of dismissal was entered.

This timely appeal followed.

## DISCUSSION

### I. Standard of Review.

"An order granting summary judgment is subject to de novo review. [Citation.]" (*Moreno v. Quemuel* (2013) 219 Cal.App.4th 914, 917–918.) Like the trial court, we employ a three-step analysis: "'First, we identify the issues framed by the pleadings. Next, we determine whether the moving party has established facts justifying judgment in its favor. Finally, if the moving party has carried its initial burden, we decide whether the opposing party has demonstrated the existence of a triable, material fact issue. [Citation.]' [Citation.]" (*Supervalu, Inc. v. Wexford Underwriting Managers, Inc.* (2009) 175 Cal.App.4th 64, 71.)

### II. Dangerous Condition of Public Property.

A dangerous condition of public property "means a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." (§ 830, subd. (a).) "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either: [¶] (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶] (b) The public entity had actual or constructive

8

notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."  (§ 835.)

As explained by our Supreme Court, the following are "well established:  first, that the *location* of public property, by virtue of which users are subjected to hazards on adjacent property, may constitute a 'dangerous condition' under [Government Code] sections 830 and 835; second, that a physical condition of the public property that increases the risk of injury from *third party conduct* may be a 'dangerous condition' under the statutes." (*Bonanno v. Central Contra Costa Transit Authority* (2003) 30 Cal.4th 139, 154 (*Bonanno*).)

**III.  Trail Immunity.**

Neither a public entity nor a grantor of a public easement to a public entity is liable for injury caused by, inter alia, a condition of:  "(a) Any unpaved road which provides access to fishing, hunting, camping, hiking, riding, including animal and all types of vehicular riding, water sports, recreational or scenic areas and which is not a (1) city street or highway or (2) county, state or federal highway or (3) public street or highway of a joint highway district, boulevard district, bridge and highway district or similar district formed for the improvement or building of public streets or highways.  [¶]  (b) Any trail used for the above purposes." (§ 831.4.)

Whether property qualifies for immunity "depends on a number of considerations, including accepted definitions of [the word trail] [citations], the purpose for which the property is designed and used, and the purpose of the immunity statute [citation]." (*Amberger-Warren v. City of Piedmont* (2006) 143 Cal.App.4th 1074, 1078–1079 (*Amberger-Warren*).)

9

In *Amberger-Warren*, the plaintiff, her friend and their two dogs were in a fenced-in, off-leash lower loop section of a dog park owned by a public entity. The lower loop was a paved pathway across a hill, which was described as a dirt embankment. When the plaintiff went up the pathway to put a leash on her dog, she was bumped by either her dog or her friend's dog and slipped on some debris on the pathway. She fell backward, landing partway off the pathway. To avoid tumbling down the hill, she grabbed an exposed cement edge and injured her hand. (*Amberger-Warren*, *supra*, 143 Cal.App.4th at pp. 1077–1078.)

The court concluded as a matter of law that the pathway was a trail under section 831.4. (*Amberger-Warren*, *supra*, 143 Cal.App.4th at p. 1078.) After reaching that conclusion, the court moved on to the next issue, which was whether the injury was caused by a condition of the trail. (*Id*. at p. 1083.)

The plaintiff argued that her injury was caused by dangerous conditions unrelated to the trail, "including: allowing dogs to run unleashed in the park; permitting debris to accumulate on the trail; failing to install a guardrail where the accident occurred; and locating the trail in a dangerous area, i.e., next to a slope onto which people could fall." (*Amberger-Warren*, *supra*, 143 Cal.App.4th at p. 1083.)

The court noted that the public entity was not liable for harm caused by third party actors "such as plaintiff's own unleashed dog unless some unimmunized conduct on its part contributed to that harm." (*Amberger-Warren*, *supra*, 143 Cal.App.4th at p. 1084.) As a result, the plaintiff's case had to hinge on the other conditions she identified. But the trail immunity covered debris on the pathway. Moreover, trail immunity applied to the design of the trail, which included the

10

absence of a guardrail. Finally, the court concluded that the hill was "not unrelated to the trail because the trail is what provides access to the hill and exposure to the alleged danger." (*Id.* at p. 1085.) The court reasoned that "location, no less than design, is an integral feature of a trail, and both must be immunized for the same reasons. To accept plaintiff's argument would be to require installation of handrails or other safety devices on trails, or relocation of trails, whenever the surroundings could otherwise be considered unreasonably dangerous. The likely and unacceptable result, which the immunity was created to avoid, would be the closure of many trails in areas that could be deemed at all hazardous." (*Ibid.*)

In our view, the court did not hold that there must be immunity for every injury occurring on a trail when an adjacent public property was a contributing factor. Rather, the court examined the causation question in light of the policy of section 831.4. It identified the issue as whether a trail and an adjacent public property meet a relatedness test. That test has two parts: proximity and liability that will likely cause the trail to close. Thus, the *Amberger-Warren* court embraced a nuanced, policy based relatedness test for determining whether an injury is caused by a condition of a trail when an adjacent public property may have contributed to the injury.

Subsequently, the court in *Prokop v. City of Los Angeles* (2007) 150 Cal.App.4th 1332 (*Prokop*) held that a city had "absolute immunity under [section 831.4] from liability for injuries by a bicyclist who collided with a chain link fence immediately after exiting a class I bikeway located" along a river. (*Prokop*, *supra*, at p. 1335.) The court noted that precedent established that "a paved class I bikeway is a 'trail' within the

11

meaning of section 831.4[.]" (*Id*. at p. 1338.) It rejected the argument that immunity did not apply because the accident occurred outside the confines of the bikeway. Citing *Amberger-Warren*, the *Prokop* court stated, "A gateway to or from a bike path is patently an integral part of the bike path. [Citation.]" (*Id*. at p. 1342.) Because *Prokop* determined the gate was part of the trail at issue, the bike path, it did not have to decide whether an adjacent public property had caused injury.

Most recently, *Leyva v. Crocket & Co., Inc.* (2017) 7 Cal.App.5th 1105 (*Leyva*) was decided. In that case, the private owner of a golf course granted the City of San Diego two public easements for an unpaved recreational hiking and equestrian trail running parallel to the golf course. The owner was sued when a person using the trail was hit by a golf ball. (*Id*. at p. 1111.)

Even if the trail came within section 831.4, the injured plaintiff in *Leyva,* Miguel Leyva, and his wife argued that "the trail's location next to the golf course 'has nothing to do with the fact that [the victim] was injured by a golf ball from the [adjacent] property,' and the golf course's lack of safety barriers on the 13th hole is not a faulty design or condition of the trail." (*Leyva, supra*, 7 Cal.App.5th at p. 1110.)

The court rejected this argument, citing to *Amberger-Warren* and *Prokop*. It stated, "Here, the Leyvas are incorrect to argue the location of the trail next to the golf course is unrelated to [Miguel Leyva's] injuries: [He] would not have been struck by the golf ball if he had not been walking on a trail located next to the golf course. Just as the trail's location next to a hill in [*Amberger-Warren*] is an integral feature of the trail, so is the trail's location next to the golf course. Further, it makes no

12

difference whether the alleged negligence in failing to erect safety barriers along the boundary between the golf course and the trail occurred on the golf course or on the trail itself because the effect is the same. [¶] Additionally, the erection of a safety barrier on the boundary of the golf course is equivalent to the installation of a handrail in *Amberger-Warren*. In that case, the court observed, "'[w]e presume that there are many miles of public trails on slopes in this state that could be made safer with handrails, and that handrails would perhaps enhance the safety of all trails, wherever located, that bear pedestrian traffic. But to require installation of handrails along every public trail where it might be reasonably prudent to do so would greatly undermine the immunity's objective of encouraging access to recreational areas . . . .' [Citation.] Similarly, public pathways along golf courses certainly could be made safer by cordoning off or erecting high barriers between the golf courses and trails. However, setting aside how the aesthetics of such barriers could mar the recreational experience for trail users, the burden and expense of erecting barriers to make recreational trails entirely safe from errant golf balls would chill private landowners . . . from granting public easements to public entities along golf courses, resulting in closure of such areas to public use. [Citation.]" (*Leyva, supra*, 7 Cal.App.5th at pp. 1110–1111.)

This triad of cases—*Amberger-Warren*, *Prokop* and *Leyva*— are at the heart of whether City is entitled to trail immunity.

**IV. City Cannot Claim Trail Immunity.**

Presuming for the sake of argument that the walkway is a trail for purposes of section 831.4, the crux of this case is whether the injury to Jacobo was caused by a dangerous condition of the

13

walkway for purposes of trail immunity.  To determine this issue, we must interpret section 831.4.

When engaging in statutory interpretation, our goal is to ascertain the intent of the Legislature.  "If the language is clear and unambiguous, the court presumes that the Legislature meant what it said and the inquiry ends.  But if the statute is ambiguous, i.e., it is susceptible to more than one reasonable interpretation, the court may use a variety of extrinsic aids.  For example, it may consider the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.  In addition, the court may consider the consequences that will flow from a particular interpretation.  [Citations.]" (*Jewish Community Centers Development Corp. v. County of Los Angeles* (2016) 243 Cal.App.4th 700, 708.)  A court "construing an ambiguous statute must avoid, if it can, an interpretation that would lead to absurd consequences.  [Citation.]" (*Id.* at p. 712.)

The plain language of section 831.4 provides immunity for injuries caused by dangerous conditions of trails, but it does not provide immunity for injuries caused by dangerous conditions of adjacent public properties.  We perceive no ambiguity in section 831.4 on this point.  But, as recognized in *Bonanno*, the location of public property can be a dangerous condition, and so too can the physical condition of a public property that increases the risk of injury from third party conduct.  When, if ever, must a dangerous condition of an adjacent public property that increases the risk of injury from third party conduct be considered a dangerous condition of a trail such that the shield of section 831.4 will cover the adjacent public property?  The statute does not

14

specify, leaving us with an ambiguity. *Amberger-Warren* resolves the ambiguity with the relatedness test. In other words, unless properties are deemed related for policy reasons, courts will not immunize adjacent public properties.

The Brookside Golf Course does not pass the relatedness test. As we explain below, *Amberger-Wilson*, *Prokop* and *Leyva* are not analogous.

The trail in *Amberger-Warren* was next to a hill described as a dirt embankment, which posed a danger of people falling. The presence or absence of guardrails would not have been an issue but for the trail. It is true that the plaintiff's fear of tumbling down the hill was a causal factor in her hand injury, but it is also true that she would not have injured her hand without being bumped by an unleashed dog, slipping on debris, falling backwards and grabbing an exposed cement edge of the trail, and if the trail had guardrails. In other words, the unleashed dog as well as conditions of the trail other than its location were substantial factors in the injury. Moreover, the trail was the very thing that provided the public access to the hill. Beyond that, neither the trail nor hill were commercial enterprises that earned profits that could be used for maintenance, safety features, and insurance, and for paying lawyers and judgments. Thus, imposing liability would have given public entities the choice of either paying for guardrails on trails next to hills or closing such trails. Due to the expense, it was likely the trails would be closed and the public would be deprived of the use and enjoyment of trails and related parks. For policy reasons, the trail and its location next to the hill could not be separated with respect to analyzing trail immunity.

15

In contrast, policy dictates that the walkway and the Brookside Golf Course be given separate immunity analysis, at least with respect to a danger posed by third party conduct on the golf course.

The Brookside Golf Course is a developed and commercially operated golf course that introduced the danger of people using the Loop getting hit by errant golf balls. In other words, there is a risk of harm posed by third parties, i.e., golfers. This danger is the result of a human creation in contrast to the naturally occurring danger posed by the hill in *Amberger-Warren* due to topography and gravity. It is common knowledge that when golf courses are in areas where errant golf balls could cause injury outside of the courses in spaces frequented by people and vehicles, they are designed to protect against such injury. And the fact that the Brookside Golf Course has a fence and strategically placed trees leads to the reasonably deducible inference that—whether successful or not—it was designed to protect people outside the course from errant golf balls hit by golfers. This clearly indicates that the designer and City were aware of the potential harm that errant golf balls might cause absent safety precautions. The danger of errant golf balls (and need for safety) exists for people outside the Brookside Golf Course regardless of whether they use the walkway. As a commercial enterprise that generates revenue, the Brookside Golf Course can pay for safety features such as the safety nets that it erected in 2001 after a pedestrian was hit by an errant golf ball. It can obtain insurance, and it can pay lawyers and judgments.

In addition, it is the Loop, of which the walkway is only a small part, that provides access to the golf course. If the walkway was eliminated—if the area it occupies was merged into

16

part of the street or turned into a sidewalk—the Loop would still provide access to the golf course.

Though the trail and Brookside Golf Course have close proximity, it is not likely that liability will cause City to close the trail given that the golf course generates revenues that can pay for maintenance and judgments. It is fair to deny the City trail immunity for a dangerous condition of the Brookside Golf Course that increases the risk of harm by third party conduct. Rather than prompting the closure of trails that abut public streets and are adjacent to publicly owned golf courses, liability will prompt such golf courses to take corrective action in a manner consistent with the accepted and expected methods of managing golf courses.

A bulwark to our conclusion is that recognizing immunity here would give City a disincentive to correct a dangerous condition of the Brookside Golf Course even if the course is revenue generating. And if the Brookside Golf Course has a dangerous condition, recognizing immunity would have the absurd consequence of requiring City to protect people using the Loop from getting hit by an errant golf ball except anyone who happens to be using the walkway.

Stripped down to its essence, we determine the following. The *Amberger-Warren* court was confronted with a case that involved dual dangerous conditions—the location of the trail and the slope of the hill—and decided the dangerous conditions should be deemed related. This served pragmatism because the trail and hill were part of the same park and presumably under the same management, and the fate of the trail and access to the hill were tied together because making them safer would involve changing the design of the trail by installing guardrails. The

17

walkway and the Brookside Golf Course also, arguably, have dual dangerous conditions—location of the walkway and insufficient fences and/or trees to block errant golf balls. But the walkway and the golf course are separable by different uses as well by the golf course's revenues. If City is held liable, it will be prompted to correct the design of the golf course rather than the design of the trail. Thus, these two arguable dangerous conditions are not related, and immunity for one should not be immunity for both.

Though City urges us to conclude that *Prokop* dictates a decision in its favor, we disagree. The gate in *Prokop* did not exist without the bikeway because they were both part of the design of the bikeway beyond mere location. And, the gate was not a separate, commercially operated property that could finance safety measures. Accordingly, there is no analogy between the facts and policies in *Prokop* and those here.

This brings us to *Leyva*. It provides no assistance to City because it involved materially different facts. The condition of the golf course could not be dangerous but for the trails. As we have indicated, the danger posed by the Brookside Golf Course would exist even if the walkway did not; there would still be a danger of errant golf balls hitting motorists and recreational users of the Rose Bowl Loop. Also, here, the Brookside Golf Course has fences and trees designed for protection of Rose Bowl Loop users, and the issue is the adequacy of those measures as opposed to their absence. Also, the *Leyva* court was concerned that liability in that case would discourage private landowners from granting easements for public use. That, of course, is not a concern in this case.

Based on all these considerations, a public golf course cannot assert a trail immunity defense when: (1) the golf course

18

is adjacent to a trail abutting a public street; (2) the golf course is a commercially operated, revenue-generating enterprise; (3) the golf course has a dangerous condition that exposes people outside it to a risk of harm from third parties hitting errant golf balls; and (4) the dangerous condition of the golf course caused harm to a user of the trail.

To be complete, we acknowledge that City would have us affirm based on the holdings of *Burgueno v. Regents of University of California* (2015 ) 243 Cal.App.4th 1052, 1061 (*Burgueno*) and *Hartt v. County of Los Angeles* (2011) 197 Cal.App.4th 1391 (*Hartt*). But neither case is on point. *Burgueno* involved a fatal collision on the Great Meadow Bikeway, which is on the campus of the University of California, Santa Cruz. The plaintiffs argued that the Great Meadow Bikeway was not a trail under section 831.4 because it had a dual use, one being transportation and the other being recreation. The court held: "Since the Great Meadow Bikeway has mixed uses that undisputedly include recreation, the Regents have trail immunity under section 831.4, subdivision (b) from claims, such as plaintiffs' claims, that arise from the condition of the Great Meadow Bikeway." (*Burgueno, supra*, at p. 1061.) The court relied, in part, on *Hartt*, which held that the mixed use of a path by service vehicles and recreational cycling did not defeat trail immunity. (*Hartt, supra*, at p. 1400.) These cases pertain to whether a particular path qualifies as a trail for purposes of trail immunity. Neither case analyzes a causation issue similar to the one herein.

## V. City's Warning Sign and Assumption of Risk Defenses.

City contends that it is entitled to summary judgment because there were warning signs on the Brookside Golf Course

fence, and because appellants assumed the risk of injury caused by errant golf balls.

A "public entity is not liable for injuries proximately caused by the dangerous condition if it renders an adequate warning." (*Foremost Dairies, Inc. v. State of California* (1986) 190 Cal.App.3d 361, 367.)  "Whether [a] warning was adequate is ordinarily a question of fact, but it may 'be resolved as a question of law if reasonable minds can come to but one conclusion. [Citations.]'"  (*Ibid*.)

The initial flaw in City's warning sign defense is that there is no evidence that it installed, owns or maintains the signs.  City does not argue that we should infer that it installed, owns and maintains the signs, and it cited no law establishing that it is entitled to a defense based on warning signs erected by a third party.  Ultimately, these issues are moot for our purposes because reasonable minds can differ regarding the adequacy of the warning signs, which is illustrated by Avrit's expert opinion that the warning signs were not adequate due to their placement as well as their verbiage.  Thus, the adequacy of the signs must be decided by a trier of fact.

This brings us to assumption of risk.

"The doctrine of primary assumption of risk is applied to certain sports or sports-related recreational activities where 'conditions or conduct that otherwise might be viewed as dangerous often are an integral part of the sport itself' and their removal would alter the nature of the sport.  [Citation.]"  (*Childs v. County of Santa Barbara* (2004) 115 Cal.App.4th 64, 69–70.)  Secondary assumption of risk arises where "the defendant owes a duty to a plaintiff who is careless in encountering a known risk created by the defendant's breach of its duty.  [Citation.]

20

Primary assumption of risk is a complete bar to recovery. Secondary assumption of risk 'is merged into the comparative fault scheme, and the trier of fact, in apportioning the loss resulting from the injury, may consider the relative responsibility of the parties.' [Citation.]" (*Id.* at p. 69.)

City argues we should affirm based on *Shin v. Ahn* (2007) 42 Cal.4th 482 (*Shin*), a case in which our Supreme Court held that the primary assumption of risk doctrine barred a golfer from suing a coparticipant after being struck by a golf ball. (*Id.* at p. 486.) *Shin* is inapposite because Jacobo and Pavon were not participants in the sport of golf at the time of the accident.

Next, City asks us to follow the reasoning of *McGuire v. New Orleans City Park Improvement Association* (2003) 835 So.2d 416 (*McGuire*). There, the court relied on Louisiana's duty-risk analysis to bar suit after a jogger was hit by a golf ball while jogging on the roadway in a park with a golf course. Because *McGuire* does not apply California's primary assumption of risk doctrine, it is not persuasive, and we decline to factor it into our analysis. It bears mentioning, however, that the *McGuire* court reached its conclusion because the plaintiff knowingly encountered the risk. Here, if appellants were aware of the risk and were careless in encountering it, that would only establish secondary assumption of the risk. Accordingly, summary judgment would not be appropriate because there would still be an issue of fact, i.e., apportionment of fault under comparative fault principles.

**VI.  Other Immunity Issues.**

City requests that we affirm summary judgment based on the immunities afforded by sections 830.6, 820.2 and 815.2, subdivision (b). We decline.

21

"Neither a public entity nor a public employee is liable . . . for an injury caused by the plan or design of a construction of, or an improvement to, public property where such plan or design has been approved in advance of the construction or improvement by the legislative body of the public entity or by some other body or employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved, if the trial or appellate court determines that there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or design or the standards therefor or (b) a reasonable legislative body or other body or employee could have approved the plan or design or the standards therefor."  (§ 830.6.)

"A public entity claiming design immunity must show the existence of three elements, "'(1) [a] causal relationship between the plan and the accident; (2) discretionary approval of the plan prior to construction; [and] (3) substantial evidence supporting the reasonableness of the design.'"  [Citations.]"  (*Grenier v. City of Irwindale* (1997) 57 Cal.App.4th 931, 939.)

City argues that there is a causal relationship between the plan or design of the Loop and the accident; the design for the Loop was approved by City or a City employee exercising discretionary authority in advance of construction; and there is substantial evidence that a reasonable public entity or employee could have approved the design.  But as we have indicated in connection with our trail immunity discussion, a dangerous condition of the walkway's location cannot be conflated with a dangerous condition of the Brookside Golf Course's lack of fences and/or trees, and any contribution of the walkway's location to appellants' injuries cannot exonerate City from liability with

22

respect to a dangerous condition of the Brookside Golf Course. The same reasoning applies to design immunity. In other words, even if City could establish design immunity for the walkway, that would not foreclose liability for injury caused by a dangerous condition of the Brookside Golf Course. Once again, our reasoning is informed by policy. A commercially operated and revenue-generating golf course should not be absolved of liability if it would not otherwise qualify for design immunity on its own merit simply because a dangerous condition of that golf course happens to cause harm on an adjacent trail. For a commercially operated and revenue-generating golf course to use the shield of design immunity, it must prove discretionary approval of its plan (versus the plan of an adjacent trail) prior to construction, and substantial evidence supporting the reasonableness of its design (versus the design of an adjacent trail). For these reasons, City's arguments about the Loop are moot.

Section 820.2 provides that except as otherwise provided by statute, "a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Pursuant to section 815.2, subdivision (b), and except as otherwise provided by statute, a public entity cannot be held liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability.

City argues that it is entitled to immunity under these statutes for the discretionary design of the Loop and nearby recreational areas. But appellants are suing based on a dangerous condition of the Brookside Golf Course rather than an injury resulting from an act or omission of a City employee, and

23

City has not explained how or why section 815.2, subdivision (b) and section 820.2 would operate to immunize City from the liability permitted by section 830.6.  We note that the recognized method for a public entity to avoid liability for a dangerous condition of public property is through the affirmative defense of design immunity.  (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 342–343.)  As explained above, City failed to establish that design immunity entitled it to summary judgment.

**DISPOSITION**

The judgment is reversed.

Appellants shall recover their costs on appeal.

**CERTIFIED FOR PUBLICATION**.


_____, Acting P. J.
ASHMANN-GERST


We concur:


_____, J.
CHAVEZ


_____, J.[*]
GOODMAN

---

[*]  Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

24