Filed 5/12/25 Bronshteyn v. Dept. of Consumer Affairs CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| DIANA BRONSHTEYN,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DEPT. OF CONSUMER AFFAIRS,<br><br>    Defendant and Appellant. | B325678, B327487<br><br>Los Angeles County<br>Super. Ct. No.<br>19SMCV00057 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark H. Epstein, Judge. Affirmed.

Law Offices of Wendy Musell, Wendy Musell; Vinick Hyams, Jean K. Hyams; Burrell Kagin Law, Darci E. Burrell for Plaintiff and Respondent.

Rob Bonta, Attorney General, Chris A. Knudsen, Assistant Attorney General, and Gary S. Balekjian and Jennifer M. Yang, Deputy Attorneys General, for Defendant and Appellant.

Diana Bronshteyn sued her former employer, the California Department of Consumer Affairs, for disability discrimination

under the Fair Employment and Housing Act ("FEHA"), Government Code section 12900 et seq. Bronshteyn, who suffered from fibromyalgia, bulging disks, and gastrointestinal issues, alleged the Department failed to provide reasonable accommodations for her disability and wrongfully discriminated against her. After a contentious trial over several weeks, Bronshteyn prevailed: the jury returned a verdict in her favor on every count and awarded her over three million dollars in damages.

The Department appealed, arguing the verdict was the "inevitable result" of the trial court's error in approving one of Bronshteyn's special jury instructions, and challenging the sufficiency of the evidence at trial.

We affirm. The disputed jury instruction is a correct statement of law. And the Department forfeited any challenge to the sufficiency of the evidence by failing to present a fair summary of the evidence.

I

We summarize pertinent facts from the July 2022 trial. When we refer to the "Bureau," we mean the Bureau for Private Postsecondary Education, the Department's subsidiary where Bronshteyn worked.

A

Bronshteyn has worked for the state government since 1999. In September 2011, Bronshteyn began working for the Bureau, which oversees all private postsecondary institutions in the state and establishes minimum standards for instruction at these institutions. At the Bureau, Bronshteyn worked as an Enforcement Inspection Analyst in its Compliance Unit. Her

2

classification in this position was Associate Governmental Program Analyst.

The official duty statement for Bronshteyn's position states that 70 percent of the Enforcement Inspection Analyst's job consists of compliance inspections, which entails travel throughout Southern California to institutions under the Bureau's purview, and preparing for these inspections. An inspection could last up to ten hours, not including travel time. The duty statement deems compliance inspections an "essential" function of the position.

Bronshteyn worked out of her home office in the Los Angeles area. In a given week, she would do no more than one onsite inspection, and there were weeks when she did none. When Bronshteyn performed onsite inspections, she drove herself as far as Atascadero, Riverside, or Orange County. While onsite, she was required to transport about 40 pounds of equipment, including a laptop, plugs, a printer, cartridges, paper files, and miscellaneous office supplies in order to carry out her duties.

Bronshteyn enjoyed her work at the Bureau. From 2012 through June 2016, she received positive evaluations and awards for her work.

B

In 2014, Bronshteyn began to experience pain in her right hand, arm, and back, along with headaches. The pain worsened in 2015. Nonetheless, she continued to perform her work, including onsite inspections. To cope with the pain, she used ice packs on her back or hand and took Advil for headaches. Bronshteyn described herself as the type of person to just "work through" physical pain, stating "I've got to finish what I started and get my job done."

3

By the summer of 2016, Bronshteyn's symptoms had worsened: she began to have spasms in her neck, right arm, and hand; stronger and more frequent headaches; back pain; sensitivity to light, smells and noise; and gastrointestinal problems. The symptoms made her onsite inspections uncomfortable and eventually became so bad that she got to a point where she "couldn't deal with it anymore."

Between July 22 and August 30, 2016, Bronshteyn had completed three onsite inspections. She was scheduled for another on August 31.

At 3:33 p.m. on August 30, Bronshteyn emailed her supervisor Michelle Alleger that she needed to reschedule the August 31 site inspection because of "extreme and constant pain in [her] right hand." Bronshteyn's email also stated her doctor had referred her to a hand specialist for tests and examinations the following day, and that she had no grip strength, which prevented her from carrying her equipment. This was the first time Bronshteyn mentioned her medical symptoms to a work supervisor.

Alleger responded by asking Bronshteyn for a doctor's note, and writing: "We are less than 24 hours from the onsite inspection. You were aware of your condition, why am I just finding this out now? Are you cancelling all of your upcoming inspections?"

Bronshteyn wrote back: "This is not a trivial matter. Of course appropriate doctor documentation will be presented as well as a thorough and complete statement. The pain has reached an unbearable level . . . When I have a complete diagnosis and know more as to the appropriate level of care I

4

require I will be able to comment on the need for rescheduling inspections and give you more complete details."

The next day, Alleger provided Bronshteyn with notices describing her rights under the Family Medical Leave Act ("FMLA"), information about worker's compensation, and a link to the Employee Assistance Program website. Alleger also contacted Candace Halverson, an analyst in the Health & Safety Unit of the Department's Office of Human Resources. The Health & Safety Unit facilitates the approval of requests for reasonable accommodations, worker's compensation, and FMLA leave, and works with management to identify accommodations.

On September 1, Bronshteyn emailed Alleger a note from her primary care physician, Dr. Giselle C. Namazie. The note stated: "[Bronshteyn] needs to restrict lifting with [right] hand activity work from now to 10/14/16. [Bronshteyn] may return to work now, with the following limitations: no lifting or carrying with [right] hand. Typing, gripping and holding with right hand will be severely restricted."

Bronshteyn then took it upon herself to search online for the appropriate form to communicate her need for a reasonable accommodation to Alleger. She found the form, titled "Request for Reasonable Accommodation," and filled it out, indicating that her disability was temporary until October 14, 2016, and requesting accommodations consistent with Dr. Namazie's September 1 letter. On September 6, Bronshteyn submitted the form to Alleger.

Bronshteyn's reasonable accommodation request form found its way to Nicole Principe, the Bureau's personnel liaison. Principe sent the request to Halverson, asking whether Bronshteyn would need a temporary modified duty ("TMD")

5

instead of a reasonable accommodation. A TMD is an accommodation program the Bureau offers to employees with short-term medical conditions. TMDs are generally no longer than six months in duration and allow the employees to keep their jobs, salary, and benefits while not performing one or more essential duties. Halverson recommended a TMD for Bronshteyn instead of a reasonable accommodation because it was normal practice for the Department to recommend TMDs for temporary injuries.

On September 13, Alleger emailed Bronshteyn a memorandum describing a TMD assignment from September 1 to October 14. According to the memorandum, the Bureau developed and approved a TMD assignment for Bronshteyn after reviewing Dr. Namazie's letter, removing the essential function of performing onsite inspections, and instead, instructing her to type and write with her left hand and "review compliance inspection files in preparation for onsite inspections when released from restricted activities."

The memorandum further advised Bronshteyn to notify Alleger immediately and provide medical verification if she needed to extend the TMD or if her work restrictions changed. It also stated: "if work accommodations are required for more than six months, a formal Request for Reasonable Accommodation must be submitted to the Health and Safety Unit for review and approval."

The memorandum concluded with a paragraph specifying that if Bronshteyn declined the TMD assignment, it would jeopardize her ability to participate in various leave and benefit programs, and then requiring her to either "accept" or "decline" the TMD assignment.

Bronshteyn checked the box accepting the TMD.

C

After Bronshteyn's first TMD expired, on October 27, Alleger emailed Bronshteyn, asking for an update on her workload and proposed site inspection schedule. Alleger did not ask if Bronshteyn would need any accommodations to perform the inspections.

Bronshteyn responded that she was not in a position to schedule inspections because on October 13, her doctor decided she needed to continue treatment for her right hand through late November, and the restrictions on her right hand needed to continue. Bronshteyn's symptoms had worsened: her hand had not improved and she began to suffer from debilitating back spasms.

Alleger replied, noting that Bronshteyn's TMD had expired already, and Bronshteyn would need to provide a new doctor's note to extend the TMD.

On November 7, Bronshteyn emailed Alleger another letter from Dr. Namazie, which indicated that she would need to refrain from using her right hand until December 12. The Bureau then continued the TMD through December 12.

Later in November, Bronshteyn received a phone roster for the Bureau via email, which had just been revised on November 21. The phone roster listed three positions as "vacant" in the Bureau's Licensing Unit. Two of the vacancies were under the management of Wayne Brenner, for whom Bronshteyn had worked before. The vacancies were at the same classification Bronshteyn held in her current position.

Bronshteyn called Brenner to ask about the vacancies. Brenner confirmed the vacancies, told her she would be a good fit,

7

and advised her to call his manager Robert Bayles. Brenner also indicated he would inquire with management to see if it would be possible for Bronshteyn to transfer to the Licensing Unit.

Bronshteyn immediately called Bayles, and told him she was looking to transfer to the Licensing Unit because of her health issues. Bayles was familiar with Bronshteyn's work product and told her that she would be an asset to the Licensing Unit. Bayles said he would speak to Leeza Rifredi, the Deputy Bureau Chief, about the transfer.

Only a few hours after Bronshteyn spoke with Bayles, she received a call with both Alleger and Alleger's manager Beth Scott on the line. This was Bronshteyn's first encounter with Scott. Scott began the call by asking Bronshteyn what issues she was having with Alleger. Bronshteyn replied that she did not have any issues with Alleger, but was having health problems. Before Bronshteyn could bring up the possibility of transferring, Scott informed her the Licensing Unit was not an option for her and did not give any reason. Scott also told Bronshteyn to find a new job, and did not respond when Bronshteyn protested that she was a good employee. Before the call ended, Scott provided Bronshteyn with the contact information for Candace Halverson in the Health & Safety Unit.

Halverson and Bronshteyn spoke later the same day. Bronshteyn asked Halverson why the Bureau had given her a TMD when she had submitted a reasonable accommodation form, and Halverson replied that a TMD was "just easier."

On December 19, Alleger emailed Bronshteyn that because Bronshteyn's second TMD had expired a week earlier, "[t]he expectation is that you are returning to your normal work duties, per your duty statement, as of December 13, 2016." Alleger's

email also stated Bronshteyn would need to perform thirteen onsite inspections throughout Southern California by April 2017, and that Bronshteyn was to send Alleger a schedule for completing these inspections by January 13, 2017, in addition to daily updates of her progress until all thirteen inspections were done.

Bronshteyn responded the next day, copying Scott, and enclosing a new note from Dr. Namazie dated December 12, extending the work restrictions through January 23, 2017. The email began with a reminder that Bronshteyn had already told Alleger and Scott that Dr. Namazie had extended her work restrictions, but Bronshteyn was not able to send them the documentation from the doctor's office because she was about to leave for mandatory training in Sacramento from December 13 to 16, 2016.

In the next paragraphs, Bronshteyn wrote that she did not think Alleger acted in good faith when she requested Bronshteyn resume scheduling inspections, because she had seen Bronshteyn at the Sacramento training, "witnessed the pain and discomfort" Bronshteyn was in, and was already aware that Bronshteyn's doctor had extended the work restrictions. Bronshteyn further wrote that Alleger's request for daily updates was "micromanagement . . . specifically connected to [her] injury and seems retaliatory in nature," and this level of micromanagement was "unfair and an inappropriate employment practice." In her sixteen years of working at the State, Bronshteyn had never been micromanaged to this degree. It was only after she had asked for a reasonable accommodation that Alleger began to treat her differently.

No one from the Department ever responded to Bronshteyn's complaint of disability discrimination.

D

On December 22, Bronshteyn met with Halverson to discuss accommodations for her work restrictions, including Dragon speech recognition software, an assistant to help carry equipment, and a lighter laptop.

When Bronshteyn again raised her interest in transferring to one of the vacant positions in the Licensing Unit and mentioned her conversations with Brenner and Bayles about possibly transferring, Halverson stated that transfer to another unit within the Bureau could only happen as a "last resort" if the Bureau could not accommodate Bronshteyn in her current position. However, Halverson also recommended Bronshteyn search for and apply to vacancies within the Department based in Southern California.

They further discussed the difference between a TMD and the reasonable accommodation process: a TMD allowed Bronshteyn to not perform all of her essential duties for up to six months, while under a reasonable accommodation, Bronshteyn would need to perform all essential duties. Bronshteyn also informed Halverson that she was awaiting results from some MRI tests.

Halverson and Bronshteyn exchanged several emails over the next week, beginning with an email from Halverson summarizing their discussion. In a December 28 email, Bronshteyn expressed willingness to try speech recognition software and assistance from another person during her onsite inspections. Bronshteyn also informed Halverson that her test

10

results had come back, and she had several bulging discs and two protruding discs, in addition to her injured right arm and hand.

At some point in late December 2016, Alleger left a voicemail for Halverson, informing her Bureau management was not willing to transfer Bronshteyn to the Licensing Unit. Halverson acknowledged receipt of voicemail in an email to Alleger, and stated she would "make a note of this" in her records.

E

On January 30, 2017, Scott, with Rifredi and Alleger on the line, called Bronshteyn and told her the work restrictions in Dr. Namazie's email had expired, and "to get back into the field." Bronshteyn was unaware that all three supervisors would be reaching out to her, and felt like she "was getting ganged up on."

That same day, Rifredi emailed Bronshteyn, copying Halverson and Scott, with the subject line "Reasonable Accommodation." The email acknowledged Bronshteyn was not able to return to full duty as an Enforcement Inspection Analyst and provided links to the Department's reasonable accommodation policy and related forms, including questions for her doctor, so the Bureau could determine if it was possible to assist Bronshteyn in carrying out her essential duties. The email also advised Bronshteyn of the February 14, 2017 deadline for returning the completed reasonable accommodation form, along with medical verification.

Two days later, Bronshteyn emailed Scott, Rifredi, and Alleger, copying Halverson, enclosing a note from Dr. Namazie, dated January 31, 2017. This note stated Bronshteyn needed to restrict using her right hand until March 14, 2017. The Bureau then extended Bronshteyn's TMD.

On February 12, 2017, Bronshteyn again raised with Halverson the possibility of transferring to the Licensing Unit as a reasonable accommodation. In her efforts to show Halverson that she would be able to perform a Licensing Unit job, Bronshteyn prepared a document summarizing the work that she had previously done for the Licensing Unit, and a proposed duty statement for a job she could do with minimal accommodations.

F

On March 1, Rifredi notified Halverson the Department agreed to extend Bronshteyn's TMD until March 14, and if Bronshteyn requested reasonable accommodations and provided medical verification, the Department would determine its ability to accommodate. However, if Bronshteyn did not provide a Reasonable Accommodation Request by March 14, the Department would consider her back to full duty.

A few days after the TMD ended, on March 20, Rifredi emailed Halverson, Scott, and Betty Saeteun (the Department's Assistant Chief for the Office of Human Resources) that she now considered Bronshteyn back to full duty and intended to ask Bronshteyn to resume onsite inspections. However, Bronshteyn then informed Alleger she was still injured and awaiting an updated note from Dr. Namazie.

Bronshteyn provided the updated medical verification from Namazie. In a March 21 letter, Dr. Namazie indicated she had reviewed Bronshteyn's duty statement, and reiterated the same restrictions as the previous notes: Bronshteyn was not to lift or carry with her right hand, and severely limit typing, gripping, and holding with her right hand. The letter stated: "[i]t is currently unknown whether her condition is temporary or permanent." Dr. Namazie also stated the restrictions were to

12

continue until May 15 and to call her office if there were any questions about the restrictions.

On March 24, Halverson emailed Rifredi about Bronshteyn's updated medical notes. The email stated it would be "difficult" for the Bureau to accommodate Bronshteyn's work restrictions. Thus, Halverson made two recommendations: to notify Bronshteyn of her options to take a medical leave of absence or disability retirement with a mandatory return of rights once she recovered from her illness; and to have an "interactive meeting" with Bronshteyn to explain the Bureau's inability to accommodate her work restrictions. Rifredi replied that she agreed with these recommendations.

On March 27, Rifredi and Saeteun met with Bronshteyn in accordance with Halverson's recommendation. Rifredi and Saeteun told Bronshteyn her TMD had expired, and that she should be ready, willing, and able to get back into the field by March 28. They did not offer any reasonable accommodations that could assist Bronshteyn in performing onsite inspections. Rather, they simply told her the Bureau was not able to meet her work restrictions as outlined in her medical notes and that the Department no longer considered her condition to be temporary.

Rifredi and Saeteun explained to Bronshteyn that she had two options: be willing and able to perform onsite inspections, or request a medical leave of absence. Rifredi told Bronshteyn that if she was not able to complete her essential functions, and did not request medical leave, then the Bureau would place her on involuntary leave and someone would come to her home to pick up all of her work equipment.

Bronshteyn was shocked. She responded that she "did not consider these to be options," found it "insulting that the Bureau

13

is not trying to work with her," and did not understand why the Bureau was unwilling to help her.

When Bronshteyn asked why she could not transfer to one of the vacant Licensing Unit positions, Rifredi responded that none of the permanent positions were at Bronshteyn's classification, and that the Bureau did not have the authority to create a new position to accommodate her.

G

By late March 2017, Bronshteyn had retained counsel. Bronshteyn's lawyer, Robyn McKibben, sent a letter to Rifredi, Scott, and Halverson on March 31, outlining Bronshteyn's potential employment claims against the Bureau. McKibben's letter accused the Bureau of failing to engage in any meaningful effort to accommodate Bronshteyn, noting the Bureau had not followed through on its offers to provide speech recognition software and an assistant for inspections, nor had it helped Bronshteyn locate vacant positions at her classification.

In an April 5, 2017 email, citing her "repeated requests for an accommodation," Bronshteyn asked Halverson to provide a list of current job vacancies and to let her know when the Bureau would provide speech recognition software and an assistant to help with onsite inspections.

The Department's Legal Affairs Division responded to McKibben's letter on April 11. The letter acknowledged Bronshteyn's request for reasonable accommodations, but stated the Department needed further clarification on Bronshteyn's medical limitations—namely, whether Bronshteyn could drive, use her left hand, or what accommodations her doctor believed were "medically warranted." It concluded by requesting Bronshteyn provide medical information describing all of her

14

limitations "as they apply to the performance of her essential job duties only and Dr. Namazie's opinion regarding appropriate accommodations, which would include an explanation as to why a particular accommodation will allow her to perform the essential job duties."

On April 20, Bronshteyn and McKibben met telephonically with Rifredi and Scott to engage in an interactive process for Bronshteyn's reasonable accommodations request. Bronshteyn was initially hopeful that they would have a productive conversation, but she ended up feeling humiliated. It seemed to her that Scott and Rifredi kept minimizing the physical and mental demands of onsite inspections. When Bronshteyn told them she had difficulty driving long distances and suggested that she take an Uber or Lyft to the school, Rifredi said this was "not an option" and that "even amputees can drive."

Bronshteyn again raised the Licensing Unit vacancies, and was told that those vacancies were "not an option" for her, with no further explanation.

Rifredi sent Bronshteyn a follow-up letter a few days later. In the letter, Rifredi requested additional medical documentation on Bronshteyn's ability to use her right hand and to drive. With respect to the accommodations Bronshteyn had requested, the letter stated the Bureau would research the "following possible technological solutions" that could enable Bronshteyn to perform her position's essential functions: Dragon speech recognition software to assist with typing and report writing requirements; tablets such as a Microsoft Surface Pro or Apple iPad Pro to reduce the weight of equipment; DocuSign and AdobeSign to reduce or eliminate the need for a mobile printer; and Lyft and Uber transportation business accounts.

The letter also addressed Bronshteyn's request to transfer to the Licensing Unit, stating: "[a]t the present, the Bureau does not have any vacant [Associate Governmental Program Analyst] positions in the Licensing division, no Licensing position is designated as a remote position due to technical limitations related to the essential functions of Licensing staff." It also stated any discussion of transfer was "premature" because the Department had not yet determined that no accommodation would allow Bronshteyn to perform the essential functions of her current position.

Rifredi began the process of emailing various people in the Department to ask about implementing the proposed accommodations. Jim Epp, the Section Chief of the Department's Client IT Support Services, responded that if the reasonable accommodation request was approved, the Department could then purchase the necessary tools and software. As for the speech recognition software, lightweight tablets, Uber, and Lyft, Epp stated: "the items you have listed are familiar to us . . . and we have installed them for others."

While the interactive process was ongoing, Bronshteyn remained on the previous TMD.

H

On May 9, when she was packing for a Compliance Unit training in Sacramento scheduled for May 10, Bronshteyn experienced an extremely painful back spasm, with "pain shooting down [her] right leg and significant pain in [her] upper and lower back." She emailed Alleger the same day, stating she would not be able to travel, as she felt it would jeopardize her health, and put her at risk of further injuring herself. Bronshteyn told Alleger she needed to take the rest of the day off

16

and emailed the following morning to use another sick day. Alleger did not respond.

The next morning, Rifredi emailed Bronshteyn: "[u]nfortunately, your absence today and tomorrow is considered AWOL unless and until you provide a medical certification that (1) indicates you were seen by the physician, (2) that in the physician's medical opinion you are incapable of traveling as required by your job duties and (3) outlining any further restrictions beyond the need for this absence, including the need for reasonable accommodations." Bronshteyn had never received an email like this one, and had never been accused of being AWOL, before she had asked for a reasonable accommodation.

That same day, Bronshteyn saw Dr. Billy Long-McElhannon, who later wrote a note verifying Bronshteyn's symptoms, stating that she presented with "severe muscle spasms, numbness, sharp pain in her lower back radiating down into her lower extremities" and that she had a "severely restricted" range of motion. Long-McElhannon opined that Bronshteyn would be unable to travel "for the foreseeable future." Bronshteyn also later testified that the back spasms were unpredictable.

Despite Bronshteyn's injury, she emailed Alleger a few days later asking for more work. Alleger told Bronshteyn "to get back out in the field," but also assigned her work from the Annual Reports Unit. Bronshteyn responded that she was going to follow her doctor's orders.

I

On June 15, 2017, Bronshteyn saw Dr. Mark Ganjianpour. In his work status note, Dr. Ganjianpour wrote Bronshteyn could return to work with the following restrictions: sedentary work

only, no use of right arm, no field work, no carrying luggage, no long distance travel, and no driving over 30 minutes or 20 miles.

On July 21, Halverson wrote to Bronshteyn to seek further clarification about the work restrictions. The letter requested that Bronshteyn provide Dr. Ganjianpour a copy of her duty statement, along with a questionnaire about whether she would be able to perform her essential job duties with or without an accommodation.

Although Bronshteyn did not respond to Halverson's letter, she submitted a new doctor's note from Dr. Benham Tabibian, dated September 5, 2017. Dr. Tabibian ordered the following restrictions: no pushing, pulling, lifting, or carrying over 10 pounds; ability to sit and stand as needed to mitigate pain; no overhead work; avoid bending, stooping, twisting, and squatting; no walking or standing for longer than 15 minutes per hour; typing no more than 20 minutes per hour. The note did not indicate how long these restrictions were to last, only that Bronshteyn's next appointment was in early October.

J

At some point in September 2017, Alleger called Bronshteyn and accused her of not performing her job duties for approximately six weeks in June and July because she had failed to address problems with her computer that had begun in May. This was the first time Alleger had raised the alleged work stoppage with Bronshteyn, despite them communicating regularly in June.

The next day, Alleger emailed Bronshteyn a Memorandum of Work Expectations, providing a timeline detailing the alleged work stoppage from June to July of 2017, and reprimanding

18

Bronshteyn for how she handled the computer problems and for not complying with office policy.

Bronshteyn was hurt by Alleger's accusations and felt the need to stand up for herself. She sent back a written response disputing the accusations. She clarified that she had informed Alleger and another manager of the computer problems and was still able to complete her work, notwithstanding the computer issues. In fact, Alleger had received positive feedback from other Bureau colleagues about the work that Bronshteyn had accomplished during the six weeks referenced in Alleger's Memorandum.

Bronshteyn also wrote: "I feel this memorandum was issued as a form [of] harassment and intimidation." She did so because she sensed Alleger's attitude towards her had changed since she had put in her reasonable accommodation request and Alleger's treatment of her kept getting worse and worse. On several occasions, Alleger requested that Bronshteyn complete tasks within needlessly short timeframes, including on dates when she knew Bronshteyn had doctor appointments, and despite knowing that Bronshteyn could only type with one hand. Nonetheless, Bronshteyn did her best to comply with Alleger's deadlines.

Despite again raising the allegation of harassment and intimidation, Bronshteyn received no response from anyone at the Department.

K

Later in September 2017, Bronshteyn received an email informing her that she and other Bureau employees needed to take their laptops to a Department office for updates to be installed. Because the closest Department office to Bronshteyn's

19

home was twelve miles away in Chatsworth, within her driving restrictions, Bronshteyn planned to take her laptop to that location.

Before she could do so, however, Bronshteyn received an email from Alleger informing her that Alleger planned to come from Sacramento to her home to pick up the laptop on September 19.

Bronshteyn attempted to decline, explaining to Alleger there was "no need for you to incur the expense and spend the time to courier my computer," as Bronshteyn was able to travel to the Chatsworth office. Bronshteyn pointed out that no other Department employee was being treated in this manner.

Alleger, however, responded that she would see to the updates on Bronshteyn's laptop due to Bronshteyn's "medical restrictions." Alleger later testified she was uncomfortable going to Bronshteyn's home, as Bronshteyn had accused her of harassment, but Rifredi insisted that she do so.

On September 19, Alleger arrived at Bronshteyn's home. Bronshteyn initially did not open the door to Alleger, calling both her union representative and attorney for assistance.

However, Bronshteyn surrendered the laptop to Alleger upon receiving a stern email from Rifredi. In this email, Rifredi reminded Bronshteyn that her laptop was government property, and her failure to give the laptop to Alleger would "result in the involvement of the Department of Consumer Affairs, Division of Investigation, the California Highway Patrol, or local law enforcement." Rifredi also threatened formal disciplinary action against Bronshteyn.

L

On September 25, 2017, Bronshteyn submitted a request for FMLA leave.  She was tired of fighting with her supervisors, which prevented her from focusing on her health and getting better.

In support of her leave request, Bronshteyn enclosed a medical note from Dr. Tabibian indicating the probable duration of her medical condition was through September 5, 2018.  The Bureau approved her request for FMLA leave through March 2018.  It approved her request for an unpaid leave of absence through September 5, 2018.

On August 22, 2018, Alleger sent Bronshteyn a letter informing her the Bureau expected her to return to work on September 6, 2018.  Alleger also asked that Bronshteyn inform the Bureau no later than August 30 of whether she would return to work, and to provide new medical documentation if she needed additional medical leave.

As she felt this was information for the Health and Safety Unit, Bronshteyn responded to Halverson instead of Alleger on August 30.  She enclosed the requested documentation, a form requesting leave through September 5, 2019, and a new reasonable accommodation request form.  In this letter, Bronshteyn wrote:  "At least since August 2016, the Department has been on notice that I've been experiencing a number of serious medical conditions and required a reasonable accommodation," and reiterated that she had first requested reasonable accommodations in September 2016.  Bronshteyn also disclosed that she had been diagnosed with fibromyalgia and was suffering from "severe spasms, fever, sweats, nausea, severe frequent headaches, diarrhea, fatigue, sleep problems, [and]

21

brain fog," among other symptoms. In her updated reasonable accommodation request form, Bronshteyn wrote: "Please advise why the reasonable accommodation form submitted Sep. 6, 2016 was not addressed."

On the leave form, Dr. Tabibian certified that Bronshteyn was incapacitated due to a medical condition from September 5, 2018 through September 5, 2019. Dr. Tabibian also provided a work status report, dated August 9, 2018, indicating that Bronshteyn could return to work with certain restrictions, similar to the ones in her previous doctor's notes.

On October 8, 2018, Scott sent a letter to Bronshteyn acknowledging her request for leave through September 5, 2019, and informing her that the medical leave of absence would continue until the Department identified an effective accommodation, or the interactive process concluded, whichever happened sooner.

Just a few weeks later, on October 24, Donise Weyeneth, a Health and Safety Manager in the Department's Office of Human Resources, sent Bronshteyn a letter seeking to "re-engage in the interactive process." Weyeneth was Halverson's supervisor. The letter referenced the restrictions listed in Dr. Tabibian's August 2018 work status report and offered several accommodations to address these restrictions. Weyeneth asked that Bronshteyn submit a complete reasonable accommodation request by November 7, 2018.

In response, Bronshteyn advised that her health condition was not yet stable and asked to delay the reasonable accommodation meeting, as she did not yet have enough information about her condition to complete the form. She further noted she was awaiting the result of a Qualified Medical

Evaluation, and delays in her worker's compensation matter resulted in delays in getting appropriate medical care.

Weyeneth wrote back to Bronshteyn about a week later on November 16, acknowledging receipt of Bronshteyn's letter, and stating: "you responded that you are not re-engaging in the interactive process at this time and will not be submitting a completed HR-34 Request for a [Reasonable Accommodation]." Weyeneth informed Bronshteyn that because she had not submitted any additional medical documentation, the Department would be closing her reasonable accommodation file. There was no acknowledgement of Bronshteyn's request to delay the process.

On November 29, 2018, Alleger notified Bronshteyn that the Department had denied her request for leave through September 2019 due to "operational need." Alleger also informed Bronshteyn she was expected to return to work on December 10, 2018.

Over the next few months, the parties continued back and forth, with the Department continuing to request additional information and clarification, and Bronshteyn, through her attorneys, asking for more time or attempting to clarify the medical documentation. In a December 2018 letter, Bronshteyn's attorney indicated she hoped to know her permanent restrictions and be ready to re-engage in the interactive process within three to five months (i.e., March, April, or May of 2019).

On Thursday, February 7, 2019, Weyeneth sent Bronshteyn a letter asking for further medical documentation by Monday, February 11, only allowing her two business days to respond. Per Weyeneth, a medical certification needed to be based upon an evaluation made within the last 30 days, and the

23

most recent documentation that Bronshteyn provided did not indicate the date Dr. Tabibian evaluated her. If Bronshteyn provided satisfactory documentation, Weyeneth wrote, the Department would not invoke the AWOL separation.

Bronshteyn's attorney responded by February 11, enclosing a six-page report from Dr. Tabibian dated February 5, 2019 stating Bronshteyn was totally temporarily disabled, and which also listed the date of exam as February 5, 2019. The letter noted: "[t]here should be no doubt of [Bronshteyn's] current work status," and invited the Department to request further information if necessary.

However, on February 14, 2019, Saeteun emailed Rifredi: "we have an opportunity to AWOL separate Ms. Bronshteyn." At trial, Saeteun admitted this to be a "poor choice of words," but that she sent this email to inform Rifredi that it was an option for the Department to end Bronshteyn's employment because Weyeneth had told her Bronshteyn missed the February 11 deadline.

On the same day Saeteun emailed Rifredi, the Department's Office of Human Resources sent a letter to Bronshteyn, notifying her it was invoking the AWOL statute, finding her to have automatically resigned, effective February 27, 2019, because she was absent without leave for more than five consecutive working days, and without proper medical documentation. The Department indicated it had marked her AWOL since November 28, 2019, her last day of approved leave. As a result, it retroactively revoked her health benefits back to November 2019, and Bronshteyn was forced to purchase COBRA health insurance for herself, her husband, and children, and pay about $18,000 for several months of health insurance coverage.

Saeteun later learned the Department did in fact receive a response from Bronshteyn by February 11. But she figured there was no need to take corrective action because Bronshteyn could just appeal the AWOL resignation decision.

M

Bronshteyn filed suit against the Department in January 2019, bringing four causes of action under FEHA: (1) failure to accommodate; (2) failure to engage in an interactive process; (3) disability discrimination; and (4) failure to take corrective measures to prevent discrimination. She sought actual damages relating to her loss of income, benefits, and medical expenses, and general damages for emotional distress and mental suffering.

The trial began on July 1, 2022. Over the next four weeks, the jury heard live testimony from 15 witnesses, including Bronshteyn, Halverson, Alleger, Brenner, Rifredi, and Saeteun.

At trial, the parties stipulated that there were several funded vacant positions—three of which were at Bronshteyn's classification—-within the Department's Licensing Unit from 2017-2018, all of which were filled with internal transfers. The Department elicited testimony from Brenner and Rifredi that all Licensing Unit positions were based in Sacramento and the Licensing Unit's data system did not allow for remote input of information. However, Brenner also testified that Bronshteyn was qualified for a position in the Licensing Unit, there was no reason someone could not remotely perform a Licensing Unit position, and that he would "absolutely" have hired Bronshteyn as an analyst in the Licensing Unit if Bureau management had allowed for it. And Halverson confirmed the Department's policy allowed for telecommuting as a reasonable accommodation, and that enabling a disabled employee to telecommute did not

25

amount to the creation of a new position for this employee. Bronshteyn testified that if Bureau management had offered her a Licensing Unit position, she would not have filed this lawsuit.

On August 3, 2022, the jury returned a verdict in Bronshteyn's favor on all four of her claims.  The verdict was not unanimous.  On most claims, the jury voted 10-2 in favor of Bronshteyn.

The jury also awarded Bronshteyn $338,013 in past economic damages and benefits, $1,736,249 in future economic damages and benefits, $500,000 in past noneconomic loss, and $750,000 in future noneconomic loss.

After the court entered judgment in Bronshteyn's favor, the Department filed motions for a new trial and for judgment notwithstanding the verdict.

The trial court denied both motions, and the Department appealed.

## II

There are two halves to the Department's appeal:  a legal challenge to Bronshteyn's Special Jury Instruction No. 12, and a substantial evidence challenge to the jury's verdict and trial court's order denying its motion for judgment notwithstanding the verdict.

## A

We independently review the correctness of Special Jury Instruction No. 12.  (See *Swanson v. The Marley-Wylain Co.* (2021) 65 Cal.App.5th 1007, 1019.)  As the plaintiff, Bronshteyn was entitled to request a correct, non-argumentative jury instruction on her theory of the case:  that the Department failed to provide reasonable accommodations for her disability.  (See *Maureen K. v. Tuschka* (2013) 215 Cal.App.4th 519, 526.)  Even if

an instruction is correct in the abstract, it is erroneous if "it is not within the issues developed by the evidence or reasonable inferences therefrom." (*Veronese v. Lucasfilm Ltd.* (2012) 212 Cal.App.4th 1, 25.) If it is likely to mislead the jury, such error is prejudicial. (*Ibid.*)

Bronshteyn's Special Instruction No. 12 states: "Elimination of an essential function is not a reasonable accommodation. An employer is not obligated to accommodate an employee by excusing the performance of essential functions." The authority cited for this instruction was the holding from *Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 985: "the FEHA did not obligate defendant to accommodate plaintiff by excusing him from the performance of essential functions."

When the Department protested that the first sentence of the instruction dictates a TMD cannot be a reasonable accommodation, the court explained a TMD would suffice for an injury that was truly temporary, such as a broken arm, but would not be a reasonable accommodation for a long-term disability.

On appeal, the Department contends Special Instruction No. 12 "misled the jury" into finding it failed to provide reasonable accommodations to Bronshteyn by "improperly defin[ing]" reasonable accommodations to exclude TMD assignments as a matter of law. According to the Department, while an employer is not required to waive an essential function as part of the reasonable accommodations process, nothing precludes an employer from doing so in its efforts to comply with FEHA. Because Bronshteyn's medical notes stated her injury was temporary, the Department argues it acted lawfully in

27

providing her with a series of TMDs that waived the essential function of onsite compliance inspections.

In support of its position, the Department points us to regulations implementing FEHA in the Code of Regulations, title 2, section 11006 et seq. ("FEHA Regulations"). The FEHA Regulations include examples of reasonable accommodations the Department claims it provided to Bronshteyn, namely: job restructuring; paid or unpaid leave for treatment or recovery; and reassignment to a "temporary position" or "[o]ther similar accommodations." (See Cal. Code Regs., tit. 2, §§11065(p)(2), subds. (E), (M), (N) & (O), 11068(d)(3).)

The Department's selective excerpts of the FEHA Regulations inaccurately convey the entire scope of an employer's obligation to provide reasonable accommodations under FEHA. A review of the FEHA Regulations shows Special Instruction No. 12 was a correct statement of law.

The FEHA Regulations define reasonable accommodations as "modifications or adjustments that are . . . effective in enabling an employee to perform the essential functions of the job the employee holds or desires." (Cal. Code Regs., tit. 2 § 11065(p)(1)(B).) Case law tracks this language. (See, e.g., *Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, 926 ["A reasonable accommodation is a 'modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired' "]; *Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1010 [same].)

The FEHA Regulations' definition of reasonable accommodations additionally provides "[n]o elimination of essential job function required." (Cal. Code Regs., tit. 2 § 11068(b).) We echoed this in *Nealy v. City of Santa Monica*

28

(2015) 234 Cal.App.4th 359, 375, when we held that "elimination of an essential function is not a reasonable accommodation." There, we explained "permitting elimination would be at odds with the definition of an employee's prima facie case . . . showing he or she can perform the essential functions of the job with accommodation, not that an essential function can be eliminated altogether to suit his or her restrictions." (*Ibid.*)

Both the Code of Regulations and case law tell us enabling a disabled employee to perform essential job functions is an essential part of providing reasonable accommodations under FEHA. Special Instruction No. 12 mirrors this important concept. The trial court did not err in adopting it.

Furthermore, as Bronshteyn notes, the language in the FEHA Regulations undermines the Department's argument that it acted lawfully in providing Bronshteyn only with a series of TMD assignments without trying to give her accommodations that would have enabled her to perform onsite inspections or reassigning her to one of the vacant funded positions. For instance, the definition of "job restructuring" in the FEHA Regulations states that it "may include, but is not limited to, reallocation or redistribution of *non-essential* job functions in a job with multiple responsibilities." (Cal. Code Regs., tit. 2 § 11065(p)(2)(E) [emphasis added]; see also *Shirvanyan v. Los Angeles Community College Dist.* (2020) 59 Cal.App.5th 82, 100 ["A restructuring of job duties may constitute a reasonable accommodation if it 'enables the employee to perform the essential functions of the job' "].) Thus, the TMD assignment the Department gave Bronshteyn was not a "job restructuring" within the meaning of the FEHA Regulations. (See *id.*)

29

And for temporary assignments as reasonable accommodations, the FEHA Regulations specify that reassignment to a temporary position "is *not* considered a reasonable accommodation under these regulations, although an employer […] may offer, and an employee may choose to accept or reject, a temporary assignment during the interactive process." (Cal. Code. Regs., tit. 2, § 11068(d)(3) [emphasis added].)

Nevertheless, in its effort to persuade us that it acted in compliance with FEHA, the Department directs us to *Raine v. City of Burbank* (2006) 135 Cal.App.4th 1215, 1223–1228 (*Raine*), which pertained to an employer that accommodated an injured police officer with a temporary light-duty desk position in the hope that he would return to his normal police officer duties. The desk assignment eliminated many of the essential functions the police officer was required to perform while on full duty. (*Id.* at p. 1228.) After six years at the desk assignment, the officer learned he was permanently disabled, and the employer advised him it could not permanently accommodate him at the desk assignment without demoting him. (*Id.* at p. 1219.) The officer sued under FEHA, and the appellate court affirmed the trial court's decision to grant summary judgment to the employer, finding that FEHA does not require an employer to convert a temporary accommodation into a permanent position to accommodate a disabled employee. (*Id.* at p. 1224.)

*Raine*, however, does not help the Department. The Department cites *Raine* for the proposition that the Court of Appeal did not suggest any wrongdoing by the employer in accommodating the police officer for six years through continuous temporary desk assignments, as it affirmed summary judgment for the employer on the officer's FEHA claim. (See *Raine*, *supra*,

135 Cal.App.4th at pp. 1223–1228.) That was not the key issue in *Raine*. Rather, the question *Raine* decided was whether the officer "was entitled as a reasonable accommodation to remain at the front-desk position permanently." (*Id.* at p. 1223.) *Raine* answered this question in the negative, finding "an employer has no duty . . . to accommodate a disabled employee by making a temporary accommodation permanent if doing so would require the employer to create a new position just for the employee." (*Id.* at p. 1227.)

Unlike the officer in *Raine,* Bronshteyn did not file this lawsuit to force the Department to convert her TMD assignment into a full-time position. As *Raine* makes clear, FEHA would not allow this type of remedy for her. (See *Raine, supra,* 135 Cal.App.4th at p. 1228.) Instead, Bronshteyn's lawsuit claims the Department never provided reasonable accommodations that would have enabled her to carry out the essential functions of the Enforcement Inspection Analyst she had held for years, and chose not to reassign her to one of the several vacant funded positions at her level. In the context of these claims, Jury Instruction No. 12 accurately and appropriately described the applicable law.

B

Turning to the Department's challenge to the sufficiency of the evidence, Bronshteyn urges us to find the Department forfeited any argument that there was insufficient evidence to support the jury's verdict through its failure to set forth all the evidence concerning the issues it raised on appeal, including evidence favorable to Bronshteyn. As the appellant contesting the sufficiency of the evidence, it was the Department's burden to set out all material evidence in its opening brief, not merely facts

31

favorable to its theory of the case. (See *Pilliod v. Monsanto Co.* (2021) 67 Cal.App.5th 591, 622.) This burden increases with the size and complexity of the record. (*LA Investments, LLC v. Spix* (2022) 75 Cal.App.5th 1044, 1061 ("*LA Investments*").) We agree with Bronshteyn that the Department failed to meet its burden and thus forfeited its ability to challenge the evidence supporting the verdict. (See *id.*)

The Department objects, claiming it fairly summarized the facts in the face of the "sheer number of communications over a three-year period that were introduced into evidence at trial" requiring it to "focus on those most relevant to the issues in the appeal." It also points out a handful of citations to evidence in Bronshteyn's favor.

The record, however, belies the Department's claims. We describe the Department's treatment of various dispositive issues at trial in its opening brief.

First, the issue of whether Bronshteyn was able to perform onsite inspections with or without an accommodation. The Department cites Bronshteyn's testimony that she suffered from unpredictable and painful back spasms that rendered her unable to drive. It was painful for her to even sit in a car. Based on this evidence, the Department claims it would have been futile to provide accommodations to Bronshteyn, because her back pain would have made it impossible for her to perform onsite inspections. But the Department disregards evidence of Bronshteyn's repeated requests for accommodations that would have allowed her to perform the onsite inspections notwithstanding her symptoms.

Second, the issue of whether the Department could have accommodated Bronshteyn by transferring her to one of the

vacant, funded positions in the Licensing Unit. The Department claimed "[t]here is no evidence in the record to support Bronshteyn's burden on this issue," before reciting evidence that all Licensing Unit employees were based in Sacramento, the Licensing Unit's specialized data system did not permit remote input of information, the Department's failed attempt to allow field employees to input information, and Bronshteyn's unwillingness to relocate to Sacramento. The Department fails to cite the parties' stipulation that there were multiple Licensing Unit vacancies at the relevant time. It omits the evidence Bronshteyn presented of the Department providing telecommuting as a reasonable accommodation to other employees, Brenner's testimony that there was no reason a Licensing Unit job could not be performed remotely, and Halverson's testimony that enabling an employee to telecommute did not amount to creating a new position for that employee.

Third, the issue of whether it was Bronshteyn or the Department that caused the breakdown in the interactive process. The Department claims Bronshteyn "removed herself from the process and instead basically told the [Department] to talk to her attorney" and that Bronshteyn, through her attorneys, refused to provide necessary medical information to process her reasonable accommodations request, thereby refusing to participate in the interactive process. But there is no mention of Bronshteyn's request to delay the interactive meeting because she was waiting for the results of her Qualified Medical Evaluation.

Lastly, the issue of whether the Department's decision to AWOL separate Bronshteyn was the result of discrimination based on her disability. The Department claims "[t]here is no

evidence of pretext or discriminatory animus in the record to overcome the [Department's] legitimate business reasons for denying Bronshteyn leave and invoking the AWOL statute." To support this claim, the Department again cites the back-and-forth between the Department and Bronshteyn's attorneys during the interactive process. The Department ignores evidence of Bronshteyn's repeated claims of harassment, discrimination, and hostility from Bureau management.

As our summation of the trial makes clear, the Department's lopsided presentation of the facts primarily cites evidence in its favor, while disregarding evidence favorable to Bronshteyn. The Department thereby forfeited any challenges to the sufficiency of the evidence supporting the verdict. (See *Hauselt v. County of Butte* (2009) 172 Cal.App.4th 550, 563 ["plaintiff has forfeited [the substantial evidence] argument because he has cited only the evidence favorable to him"].) We presume the record contains evidence sustaining every finding of fact and do not reach the merits of the Department's claims. (*LA Investments*, *supra*, 75 Cal.App.5th at 1061.)

## DISPOSITION

We affirm the judgment and award costs to Bronshteyn.


WILEY, J.

We concur:


STRATTON, P. J.          VIRAMONTES, J.

34